**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

GALE FORCE ROOFING AND
RESTORATION, LLC,

        Plaintiff,

v.                                Case No.:  21-cv-00246-MW-MAF

JULIE I. BROWN, in her official
capacity as Secretary of the Florida
Department of Business and
Professional Regulation,

        Defendant.

_____/

**EMERGENCY MOTION FOR PRELIMINARY INJUNCTION**
**AND REQUEST FOR ORAL ARGUMENT**

Plaintiff, Gale Force Roofing and Restoration, LLC ("Gale Force"), by and through its undersigned attorneys, moves this Court for preliminary injunctive relief against Defendant, Julie I. Brown, in her official capacity as Secretary of the Florida Department of Business and Professional Regulation, to enjoin enforcement of Chapter 2021-77, Laws of Florida (hereinafter, the "Act"), which infringes on the right to freedom of speech protected by the First Amendment to the U.S. Constitution.

Because the Act violates Plaintiff's constitutional rights, it should be enjoined before it takes effect on July 1, 2021.

### *Introduction*

The Florida Legislature passed the Act, which (among other things) prohibits a contractor from "contacting" a "residential property owner" in a manner that "encourages," "instructs," or "induces" that homeowner to contact the contractor "for the purpose of making an insurance claim for roof damage." Act, § 1. Specifically, it threatens licensure suspension/revocation and enormous fines up to $10,000 ***per*** violation of the Act. *Id.* The Act goes into effect July 1, 2021. *Id.* at § 15.

These unprecedented restrictions are a blatant attack on Plaintiff's First Amendment rights as it makes it unlawful to provide accurate, truthful information to customers regarding the potential availability of insurance coverage to repair storm damaged property. To be sure, the Act is not narrowly tailored to prohibit encouraging a homeowner to file a ***false*** claim – something the state of Florida undoubtedly could (and does) prohibit. The Act prohibits ***any*** communication (in any written medium or spoken word) that in any manner directs a homeowner to contact the contractor that results in making a ***valid*** insurance claim for roof damage. Act, § 1. The state of Florida lacks any compelling interest in its infringement on Plaintiff's fundamental constitutional rights. And even if it could show a compelling interest, the Act is not narrowly tailored.

Even more egregious, the Act goes beyond just regulating contractors licensed under Chapter 489 and creates a catch-all provision that penalizes **anyone** that "encourages," "instructs," or "induces" a homeowner to contact a contractor or public adjuster "for the purpose of making an insurance claim for roof damage." Any person that does so is "guilty of unlicensed contracting and is subject to the penalties set forth in s. 489.13." Act, § 1; *see* § 489.13(3),(7) (authorizing criminal penalties against an unlicensed contractor and fines up to $10,000 per violation)).

The Act is an unconscionable attack on the right for homeowners to receive truthful information from licensed contractors about damage homeowners may have to their property and a thinly-veiled attempt to prevent homeowners from making valid claims to repair and rebuild their homes. For all these reasons, and as described further below, Plaintiff seeks an order preliminarily enjoining its enforcement before it goes into effect on July 1, 2021.

### Factual Basis

Plaintiff regularly performs remedial and repair work in exchange for insurance benefits owed to homeowners under their residential insurance policies. *See* Affidavit of Alexander Dewey at ¶ 4 ("Dewey Aff.")

(a copy of this affidavit is attached hereto as **Exhibit A**). Plaintiff regularly advertises to homeowners who may have suffered storm damage to contact Plaintiff to allow Plaintiff to inspect their property (including the roof system) and determine the nature and extent of storm damage the property may have suffered. Dewey Aff., ¶ 5. Plaintiff then truthfully conveys to homeowners the nature and extent of the damage (if such is found) and encourages homeowners to contact their insurance company to make a claim under their residential insurance policy to determine if it is covered damage and if the insurer will provide policy benefits to assist in paying for the repairs. Dewey Aff., ¶ 4—6. The Act will necessarily (indeed, by design) outlaw Plaintiff's advertising that it can assist homeowners recover from the life-interrupting damage Mother Nature brings to Florida each year. Dewey Aff. at ¶¶ 7—8.

The plain text of the Act targets and seeks to prohibit speech the Legislature has determined is disfavored. It is apparent from the Act's short legislative history the Legislature was seeking to ban speech. When considering the House companion version (HB 305), the Legislature reviewed advertisements by contractors discussing storm damage to homes in Florida. It was these advertisements the Legislature used as a

reason to pass legislation outlawing speech by contractors regarding property insurance claims. *See* Civil Justice  & Property Rights Subcommittee, *April 6, 2021 Action Packet*, at pp. 11—12.[1] The advertisement reviewed by the House Civil Justice & Property Rights Subcommittee merely provided truthful information that the individual's home "has a high probability of needing repair" and that insurance coverage may be available to complete the necessary repair to or replacement of the roof system. *Id*. at p. 12.[2] Since the goal was to make unlawful that speech by a contractor (or anyone else), it is clear the Legislature was openly seeking to ban speech it disfavored.

If the Act becomes law (July 1, 2021), Plaintiff will be subject to immediate liability and potential enforcement of this Act given its business to assist Florida homeowners with recovering from the impact of Florida's harsh and unpredictable weather. Dewey Aff. at ¶¶7—8.

---

[1] A copy of this Action Packet is available on the House Civil Justice  & Property Rights Subcommittee's website. (https://www.myfloridahouse.gov/Sections/Documents/publications.aspx?CommitteeId=3097&PublicationType=Committees&SessionId=90&DocumentType=Action%20Packets) (last accessed June 21, 2021)

[2] This language from the House companion bill was added to the Act by a strike-all amendment (Amendment 334081 to CS/CS/CS/SB 76 (2021)) that was approved by the House on April 27, 2021. The Act returned to the Senate where it concurred in Amendment 334081 on April 30, 2021 – the final day of the legislative session.

# MEMORANDUM OF LAW

## I.    Legal Standard

The standard for granting a preliminary injunction is well defined in this circuit, and this Court may grant such injunctive relief if Plaintiff shows:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Siegel v. LePore*, 234 F.3d 1163, 1175 (11th Cir. 2000).  Of course, the burden is on Plaintiff to establish each of these four elements. For this Court to grant Plaintiff's request for preliminary injunctive relief, it need not assure itself "that the evidence positively, guarantees a final verdict in plaintiff's favor." *Levi Strauss & Co. v. Sunrise Intern. Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995).  Rather, Plaintiff must simply produce evidence to establish each of the four elements listed above. *Id.* As shown below, Plaintiff can easily satisfy each of the elements.

## II.    Plaintiff Has a Strong Likelihood of Success on the Merits

Though each factor is important, the "*sine qua non* of the four-part inquiry is likelihood of success on the merits," and if the moving party

cannot demonstrate that they are likely to succeed in their quest, the remaining factors become "matters of idle curiosity." *Puertorriqueno de Trabajadores v. Fortuno*, 699 F.3d 1, 10 (1st Cir. 2012) (citing *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002)). In fact, "in the First Amendment context, the likelihood of success on the merits is the linchpin of the preliminary injunction analysis." *Fortuno*, 699 F.3d at 10—11.

The First Amendment, which is applicable to the States through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech." *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015). A government entity "has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Id.* (*citing Police Dept. of Chicago v. Mosley,* 408 U.S. 92, 95 (1972) (internal quotations omitted). Laws that attempt to regulate speech based on its communicative content are ***presumptively unconstitutional*** and may be justified only if the government can establish the laws are narrowly tailored to serve compelling state interests. *Id.* Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the message expressed. *Reed*, 135 S. Ct. at 2227. In

evaluating the constitutionally of governmental regulation of speech, a court must consider whether the statute "on its face" draws distinctions based on the message a conveyed. *Id.* When a state "entirely prohibits the dissemination of truthful, nonmisleading commercial messages" this Court must undertake the "rigorous review that the First Amendment generally demands." *44 Liquormart, Inc. v Rhode Island*, 517 U.S. 484, 501 (1996). Defendant bears the burden of proving the constitutionality of its regulation of free speech. *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). But the Act cannot withstand this "rigorous review."

As explained below, Plaintiff can show that Defendant will not be able to defend its regulation of Plaintiff's speech. Accordingly, Plaintiff satisfies its burden to show it will be successful on the merits.

### A.   *The Act Cannot Survive Strict Scrutiny*

This Court must apply "heightened judicial security" when reviewing a statute that imposes a "specific, content-based burden on protected expression." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 565 (2011). Even in the commercial speech context, "[t]he First Amendment requires heightened scrutiny whenever the government creates 'a regulation of speech because of disagreement with the message it

conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). Indeed, "it is all but dispositive to conclude that a law is content-based and, in practice, viewpoint-discriminatory," because such laws are "'presumptively invalid.'" *Id.* at 2668 (quoting *R.A. V. v. St. Paul*, 505 U.S. 377, 382 (1992)).

A complete prohibition on "truthful, nonmisleading commercial speech" rarely will survive judicial scrutiny since the state's interest in protecting consumers almost never applies to truthful speech that is not otherwise misleading, harassing, or the like. *44 Liquormart, Inc.*, 517 U.S. at 502. These bans are typically disguised attempts to enforce some particular government policy that should be done without infringing on protected speech. The Supreme Court explained:

> Precisely because bans against truthful, nonmisleading commercial speech rarely seek to protect consumers from either deception or overreaching, they usually rest solely on the offensive assumption that the public will respond "irrationally" to the truth. The First Amendment directs us to be especially skeptical of regulations that seek to keep people in the dark for what the government perceives to be their own good. That teaching applies equally to state attempts to deprive consumers of accurate information about their chosen products[.]

*Id.* at 503 (internal citations omitted).

For instance, in *Sorrell*, the Supreme Court determined a Vermont

statute prohibiting certain advertisements by pharmaceutical companies violated the First Amendment. 564 U.S. at 557. The statute prohibited pharmacies from "disseminating prescriber-identifying information for marketing." *Id.* at 562. In other words, pharmacies could not "communicate" to pharmaceutical manufacturers information about local doctors and the medicines they prescribe – including frequency, dosage, generic v. non-generic, etc. Since the law prohibited pharmacies from communicating truthful information in order for drug manufacturers to market their products more effectively it plainly imposed content-based restrictions and was subject to "heightened judicial scrutiny" or strict scrutiny. *Id.* at 564—65. Since the "creation and dissemination of information are speech within the meaning of the First Amendment," Vermont had a steep hill to climb to save its statute. *Id.* at 570.  And it could not make that climb.

Vermont's reasoning for enforcing its prohibitions (protecting medical privacy, avoiding harassing speech, and protecting the doctor-patient relationship) each fell flat. *Id.* at 572. At bottom, Vermont essentially was unhappy with the pharmacists' speech and passed a law to stop it. The Court concluded:

> Vermont may be displeased that detailers who use prescriber-identifying information are effective in promoting brand-name drugs. The State can express that view through its own speech. ***But a State's failure to persuade does not allow it to hamstring the opposition***. The State may not burden the speech of others in order to tilt public debate in a preferred direction. "The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that ***the speaker and the audience, not the government, assess the value of the information presented***.

*Id.* at 578—79 (cleaned up) (emphasis added).

The Eleventh Circuit recently considered two similar attempts in the state of Florida to regulate (ban) speech. In *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1308 (11th Cir. 2017), the Eleventh Circuit considered the state of Florida's attempt to prohibit doctors from asking patients about firearms in the home (and other similar requirements). The Eleventh Circuit considered it "not a hard case" to determine it was content-based and subject to strict scrutiny:

> The record-keeping and inquiry provisions expressly limit the ability of certain speakers—doctors and medical professionals—to write and speak about a certain topic—the ownership of firearms—and thereby restrict their ability to communicate and/or convey a message. As a result, there can be no doubt that these provisions trigger First Amendment scrutiny. "[S]peech is speech, and it must be analyzed as such for purposes of the First Amendment.

*Id.* at 1307 (quoting *King v. Governor of New Jersey*, 767 F.3d 216, 229 (3d Cir. 2014)).

The test of whether a statute is a content-based restriction is simple – if the state has to look at the words being said in order to determine whether there is a violation, it is a content-based restriction. The statute prohibited doctors from speaking about firearms in the home – the state had to listen to what the doctors said in order to determine whether the statute was violated. Plainly, a content-based restriction on speech. The Court also rejected Florida's attempt to characterize the speech as part and parcel of the regulation of professional conduct. *Id.* at 1308. Since the statute impermissibly told doctors what they could and could not say about firearm ownership, the Eleventh Circuit determined it violated the First Amendment and prohibited its enforcement.

Likewise, even more recently, the Eleventh Circuit considered an attempt to ban speech by therapists under a city's authority to protect minor children as well as regulate professional conduct. *Otto v. City of Boca Raton, Florida*, 981 F.3d 854, 861 (11th Cir. 2020). The Court reviewed a local ordinance prohibiting "the practice of seeking to change an individual's sexual orientation or gender identity." *Id.* at 859. Relying on *Wollschlaeger*, the Court found the regulation to be a content-based

restriction, subject to strict scrutiny, since the application of the regulation depended on what was being said. *Id.* at 861. The Court also reiterated the oft-repeated refrain:

> Strict scrutiny . . . means we must consider whether the ordinances are narrowly tailored to serve compelling state interests. Laws or regulations almost never survive this demanding test . . . . Forbidding the government from choosing favored and disfavored messages is at the core of the First Amendment's free-speech guarantee.

*Id.* at 861—62 (internal citations and quotations removed).

Turning to the Act before this Court. The Act prohibits a contractor from sending any "communication" that "encourages," "instructs," or "induces" a homeowner to contact a contractor or public adjuster for the purpose of making an insurance claim for roof damage regardless of whether the homeowner in fact suffered roof damage and is entitled to file a claim for insurance coverage. The Act clearly only applies to certain speech: speech regarding making a roof insurance claim. The Act targets speech the Legislature disagreed with based on the idea and message expressed. The Supreme Court and the Eleventh Circuit have made clear the Legislature cannot attempt to tip the scales and forbid speech it does not agree with. Whether the sale of alcohol (*44 Liquormart*), pharmaceuticals (*Sorrell*), firearms (*Wollschlaeger*), conversion therapy

(*Otto*), or contractors advertising their services (the Act), Florida cannot dictate what may be said in the marketplace of ideas.

The Act also applies across the board to anyone who engages in such speech – sweeping up a vast amount of protected speech. This would make unlawful a homeowner walking next door to her neighbor and truthfully informing her that she recently had her roof repaired or replaced by a contractor and it was covered by her insurance policy and that she should do the same thing. That simple act of neighborly kindness would amount to "encouraging" her neighbor to call a contractor for the purposes of making a roof insurance claim – imposing fines up to $10,000.

On its face, the state of Florida has set forth a content-based restriction on truthful speech and cannot provide any legitimate justification in its defense. The state of Florida (or insurance companies) may not like contractors telling homeowners to file an insurance claim for the damage to their homes and assist them in performing repairs in exchange for those insurance proceeds, but it cannot tilt the scales against contractors by prohibiting the communication of truthful information.

As set forth above, Plaintiff has shown it will be successful on the merits in this case since the Act is a content-based restriction on

Plaintiff's speech that is entitled to full First Amendment protection. Not only is the statute presumptively unconstitutional, but **Defendant** must come forward with evidence that the statute serves a compelling governmental interest and that it is narrowly tailored to support that interest. Neither factor can be met in this case. *Thompson*, 535 U.S. at 373; *Edenfield*, 507 U.S. at 770.

Although Defendant will likely identify additional interests in response to this motion, Defendant has not presented any legitimate (much less compelling) governmental interest, to date, that supports the Act. At best, the Act's sponsors suggested its interests were ensuring fewer property insurance claims were filed. Fewer insurance claims is not even a legitimate interest if it comes at the expense of property owners who have valid claims. But this interest was asserted without any analysis of whether the claims it seeks to prevent are valid claims that homeowners have bargained for in exchange for paying thousands of dollars in policy premiums. *See* Pl's. Compl. at ¶¶ 6—7. Florida's Insurance Commissioner, David Altmaier, bemoaned that "Florida has become a beacon for companies who canvass neighborhoods **creating roofing claims that would not otherwise be filed**." *Id.* (statement of

David Altmaier) (emphasis added). Representative Rommel boasted the Act will stop "the abusive practices of these few bad actors, where they encourage homeowners to file insurance claims or even lawsuits." *Id.* (statement of Rep. Rommel). Prohibiting homeowners from filing valid claims for damage to their property is not a valid state interest, much less a substantial state interest. Stacking the deck in favor of a particular industry to protect its bottom line does not come close to a compelling government interest sufficient to support stifling free speech.

Finally, even if there was a compelling government interested identified, since the Act's provisions are not narrowly tailored, they do not survive strict scrutiny. The Act is not limited to restricting communication regarding the filing of ***false*** claims which is already prohibited under Florida law. *See* § 817.234 ("Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree."). Instead, the Act encompasses any and all speech that "encourages," "instructs," or "induces" a homeowner to contact a contractor for the purposes of making an insurance claim. In other words Act prohibits truthful advertisements

by licensed contractors (or their agents) regarding valid insurance claims. The across-the-board prohibition without any exception is not narrowly tailored and falls well short of the Supreme Court's First Amendment jurisprudence.

Plaintiff easily satisfies its burden to show that it is likely to succeed on the merits. The Act (specifically, Section 1's creation of § 489.147) is a First Amendment violation and should be enjoined.

## B.   Plaintiff will Continue to Suffer Irreparable Injury Without an Injunction

If this Court does not grant this injunction, Plaintiff will suffer irreparable injury. The Supreme Court as explained "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Thus, "irreparable injury is presumed upon a determination that the movants are likely to prevail on their First Amendment claim." *Fortuno*, 699 F.3d at 11. The loss of First Amendment freedom can be shown both by actual enforcement of the unconstitutional act or the threatened enforcement. *Elrod*, 427 U.S. at 373—74 (holding that irreparable injury was shown since some plaintiffs were threatened termination based on

their exercising their First Amendment rights and other plaintiffs had voluntarily stifled their speech to avoid discharge).

Likewise, in the present case, Plaintiff suffers from the very same threats of prosecution. Plaintiff regularly performs remedial and repair work in exchange for insurance benefits owed to homeowners under their residential insurance policies. Dewey Aff. at ¶ 4. Plaintiff regularly advertises to homeowners to contact Plaintiff to allow Plaintiff to inspect its property (including the roof system) and determine the nature and extent of storm damage the property may have suffered. Dewey Aff., ¶ 4. Plaintiff then truthfully conveys to homeowners the nature and extent of the damage (if such is found) and advises homeowners to contact their insurance company to make a claim under their residential insurance policy to determine if it is covered damage and if the insurer will provide policy benefits to assist in paying for the repairs. Dewey Aff., ¶ 5—6. Necessarily, as a part of this process, Plaintiff must encourage homeowners (if proper) to file an insurance claim. The Act will necessarily (indeed, by design) prevent Plaintiff from providing high-quality services to its customers or advertising to potential customers

that may have suffered life-interrupting damage caused by the many storms that occur throughout Florida each year. Dewey Aff. at ¶ 8.

If the Act becomes law (effective July 1, 2021), Plaintiff will be subject to immediate liability and potential enforcement of this Act given its business to assist Florida homeowners with recovering from the impact of Florida's harsh and unpredictable weather. Accordingly, Plaintiff will continue to suffer irreparable injury absent an injunction.

## C.   Granting an Injunction will not cause any Hardship to Defendant

There is no hardship that would be suffered by Defendant if the preliminary injunction were issued. Indeed, no harm will occur to Defendant if Plaintiff is permitted to exercise its constitutional rights. *Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1365 (M.D. Fla. 2000) (granting a preliminary injunction and determining the injunction will cause no harm to the city since it "has no interest in enforcing an unconstitutional law"). In contrast, Plaintiff stands to lose its First Amendment freedoms – the balance of hardships weighs decidedly in favor of Plaintiff on this point.

## D.   There is a Significant Public Interest of Upholding the First Amendment Protections at Stake

It is well settled in this circuit that "the public interest is always

served in promoting First Amendment values." *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1276 (11th Cir. 2001). It is important to vindicate Plaintiff's right to freedom of speech and impose the necessary limits on the government's ability to regulate speech:

> The "theory of our Constitution" is that "the best test of truth is the power of the thought to get itself accepted in the competition of the market." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). The Florida Legislature overstepped the boundaries of the First Amendment when it determined that the proper remedy for speech it considered "evil" was "enforced silence," as opposed to "more speech." *Whitney v. California*, 274 U.S. 357, 377, 47 S.Ct. 641, 71 L.Ed. 1095 (1927) (Brandeis, J., concurring).

*Wollschlaeger*, 848 F.3d at 1329 (William Pryor, J. concurring).

Since Plaintiff is undisputedly protecting its First Amendment rights, this Court should find that Plaintiff has met its burden as to showing the requested injunction would be in the public interest.

## **CONCLUSION**

Plaintiff has met each of the four requirements for obtaining a Preliminary Injunction under Federal Rule of Civil Procedure 65. Plaintiff requests this Court issue an Order temporarily enjoining Defendant from enforcing the Act, with the injunction to begin prior to July 1, 2021.

## **REQUEST FOR ORAL ARGUMENT**

Plaintiff requests oral argument on this motion and suggests it would aid the Court in determining this matter. Plaintiff estimates 2 hours would be sufficient to present the necessary information to the Court.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on June 22, 2021, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF portal and will be served on the Defendant via Service of Process.

**WEBER, CRABB & WEIN, P.A.**

*/s/ Jeremy D. Bailie*
Jeremy D. Bailie, Esquire
FBN: 118558
Primary: jeremy.bailie@webercrabb.com
Secondary: lisa.willis @webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
Phone No.: (727) 828-9919
Fax No.: (727) 828-9924