**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**TALLAHASSEE DIVISION**

GALE FORCE ROOFING AND
RESTORATION, LLC,

      Plaintiff,

v.                                                            Case No.: 4:21-cv-00246-MW-MAF

JULIE I. BROWN, in her official
capacity as Secretary of the Florida
Department of Business and
Professional Regulation,

      Defendant.

_____/

## PLAINTIFF'S REPLY TO DEFENDANT'S RESPONSE IN OPPOSITION TO AMENDED MOTION FOR PRELIMINARY INJUNCTION

Plaintiff, Gale Force Roofing and Restoration, LLC ("Gale Force"), by and through its undersigned attorneys, hereby files its Reply to Defendant's Response in Opposition to Amended Motion for Preliminary Injunction ("Response").

## INTRODUCTION

The 2021 Session of the Florida Legislature was described by the former chairman of the Senate Judiciary Committee as "Spaghetti Politics"

– throwing everything against the wall and see what sticks.[1] Indeed, the Florida Legislature has been accused multiple times in the past few weeks of violating the First Amendment rights of social media companies,[2] political committees raising funds to support or oppose ballot initiatives,[3] and now contractors. The Act similarly infringes on speech that is protected by the First Amendment and it should meet a similar fate. Defendant's arguments to the contrary are insufficient to save the Act.

*First*, Defendant attempts to re-write the statute in their briefing to try and salvage the Act. Its efforts are admirable but unavailing. The statute as written applies far more broadly and sweeps up substantially more speech than Defendant admits. *Second*, this Court must apply strict scrutiny to the restrictions of Gale Force's speech since it is plainly a content-based restriction. *Third*, even if this Court were to apply intermediate scrutiny – the Act would likewise be found unconstitutional.

---

[1] Hayes, Kelly, *'Spaghetti Politics': Pinellas legislators recap 2021 Session*, Florida Politics, June 16, 2021 (last accessed July 7, 2021) (https://floridapolitics.com/archives/436171-spaghetti-politics-pinellas-county-legislators-recap-2021-session/) (statement of Sen. Jeff Brandes).

[2] *NetChoice, LLC, et al v. Ashley Brooke Moody, et al,* Case No.: 4:21-cv-220-RH-MAF (N.D. Fla. June 30, 2021) (order enjoining Florida Statutes §§ 106.072 or 501.2041 from being enforced based on apparent violations of the First Amendment)

[3] *The American Civil Liberties Union of Florida, Inc., et al. v. Laurel Lee, et al*, Case No.: Case No. 4:21-cv-190-AW-MJF (N.D. Fla. July 1, 2021) (order enjoining Ch. 21-16, § 1, Laws of Fla. based on apparent violations of the First Amendment)

*Fourth*, the harm alleged – violations of First Amendment rights – categorically, if found, equate to irreparable harm for which there is no public or state interest that must be balanced.

When Defendant's brief is stripped of its hyperbole regarding homeowners "conned" into making insurance claims and unsupported accusations about a state flooded with insurance fraud by contractors (which by its own admission is a small percentage), there is little left for this Court to consider. Essentially, the only thing remaining is Defendant's claim it should be able to regulate what a contractor (or anyone else) says to homeowners about filing an insurance claim because by doing so it ***may*** have some (unknown) impact on insurance fraud in the state of Florida. Since that plainly does not meet any level of constitutional scrutiny, the Act should be preliminarily enjoined.

## I.  Defendant's Attempts to Narrow the Act's Plain Language are Unavailing

Defendant begins its analysis of the Act by again trying to re-frame the question presented. In its view, the Act merely prohibits contractors from advertising via electronic or written mediums to specific homeowners for the purpose of encouraging a consumer to make an

insurance claim for roof damage. *See* Response, p. 11. The statutory language itself belies such a limited application.

As with any issue of textual interpretation, this Court must begin with the plain language used and the focus must be the words used in the statute. On this topic, the Eleventh Circuit instructs this Court to "determine whether the language at issue has a plain and unambiguous meaning, and, if so, we need go no further." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1276 (11th Cir. 2020) (cleaned up). Florida courts require their statutes to be interpreted in a similar manner. "A basic tenet of statutory interpretation is that a statute should be interpreted to give effect to every clause in it, and to accord meaning and harmony to all of its parts." *Jones v. ETS of New Orleans, Inc.*, 793 So. 2d 912, 914–15 (Fla. 2001). "Statutory phrases are not to be read in isolation, but rather within the context of the entire section." *Acosta v. Richter*, 671 So. 2d 149, 153–54 (Fla. 1996).

*First*, Defendant suggests the Act only applies to communication that "target a specific person" but such necessarily changes the plain language of the statute. *See* Response, p. 11. The Act defines solicitation as "contacting" in three different avenues: (in person, by electronic

means, or delivery to a specific person). Importantly, these three options are joined by the word "or," which is a disjunctive meaning each is an alternative option. See, generally, *In Re Krieg*, 951 F.3d 1299, 1301 (11th Cir. 2020) (describing the use of the word "or" as implying alternative methods for compliance). Defendant would read the statute as "and" implying each of the options are limited by the phrase – "delivery to a specific person." But such is not a fair reading of the act. Each of the options for "contacting" a homeowner (in person, electronically, or delivery to a specific person) are each independent bases that would establish liability under the Act.

*Second*, Defendant again ignores the plain language of the Act and attempts to cabin its application just to contractors when it clearly applies to anyone who engages in the conduct prohibited by the Act. The Act (§ 489.147(4)(b)) expands the application of Section 1 far beyond licensed contractors to reach "***any*** person acting on behalf of the contractor" or "***any*** unlicensed person who engages in an act prohibited by this section." The word "any" means what it says – any person. Any individual – attorney, neighbor, etc. – that engages in prohibited conduct will potentially face the same serious sanctions facing Gale Force. An

incredibly broad statutory scheme to be sure. While this Court should void reaching constitutional question in the application of a statute if it need not, this Court may not rewrite the plain language of the text to narrow its application and "skirt the constitutional infirmity." *Bailey*, 190 F.3d at 324. Defendant's limiting attempts should be rejected.

To summarize, the Act prohibits (in extraordinarily broad strokes) any type of communication that suggest filing of an insurance claim by any person. It also prohibits communication between a contractor and a customer that seeks to truthfully inform the customer how he or she may be able to pay for repairs that are necessary to remedy storm damage.

With this proper scope of the Act in mind, turning now to the injury alleged by Gale Force and the level of scrutiny this Court must apply.

## III. The Act Fails Strict Scrutiny

Defendant takes issue with Gale Force's application of strict scrutiny to the Act. Importantly, though, Defendant makes no argument that the Act survives strict scrutiny effectively conceding the Act cannot meet its rigorous demands. This Court is bound by Supreme Court precedent to apply strict scrutiny to the Act. But before beginning this analysis it is important to understand the two types of communications Gale Force has pleaded will be infringed if the Act remains in effect: (1)

the professional advice from Gale Force to a homeowner advising their roof is in need of replacement, explaining that the cost of the work may be covered by an insurance policy, and requesting the consumer contact Gale Force regarding the same; and (2) communication telling homeowners to contact Gale Force as their roof system may have damage that their insurance policy will cover.

### A. Professional Advice is Not Commercial Speech and is Subject to Strict Scrutiny

The communication by Gale Force to a homeowner providing its professional opinion regarding the status of the property and its need for a roof replacement is squarely professional speech and outside the realm of the commercial speech doctrine. The state can no more come between a contractor and a homeowner than it could come between a doctor and a patient, CPA and client, or the like. The Eleventh Circuit in *Wollschlaeger* and *Otto* squarely resolved the issue as to the Gale Force's professional speech to homeowners conveying its advice that a home (that has been inspected) needs a roof repair/replacement and that homeowner should contact Gale Force to have that work done with the understanding to have the work paid for by an insurance company. *Wollschlaeger v. Governor, Florida*, 848 F.3d 1293, 1308 (11th Cir. 2017) (en banc)

(determining whether the state of Florida could prohibit doctors from "making a written inquiry or asking questions concerning the ownership of a firearm or ammunition"). Although, *Wollschlaeger* side-stepped the question of what level of scrutiny to apply, in *Otto*, the Eleventh Circuit resolved the issue requiring "content-based regulations" to be reviewed "under strict scrutiny." *Otto v. City of Boca Raton, Florida*, 981 F.3d 854, 861 (11th Cir. 2020) (citing *Wollschlaeger*, 848 F.3d 1293, 1307).

The Act regulates what a professional may say (content-based) based on who is saying it (a contractor). This content-based and speaker-based discrimination subjects the Act to strict scrutiny. The state of Florida attempts to come in between a contractor and his or her customers (including when that speech is done in person) in order to limit what the contractor can truthfully convey to homeowners. Simply describing this Act as "commercial speech" in order to obtain a more forgiving level of review is not enough. *Dana's R.R. Supply v. Attorney Gen., Florida*, 807 F.3d 1235, 1248 (11th Cir. 2015) (holding that the State of Florida "merely wrap[ed] a law in the cloak of 'commercial speech' . . . [to] immunize it from the highest form of scrutiny.").

Simply calling every communication that comes from a contractor

regarding filing an insurance claim an "advertisement" in order to subject it to a lower level of scrutiny is a wolf in sheep's clothing. It is also important to understand how this communication would work in the contractor context. As Mr. Dewey explained (and Gale Force pleaded), a contractor cannot opine from a distance (in most circumstances) that a roof needs to be repaired or replaced – an inspection must be done first. *See* Second Affidavit of Alexander Dewey at ¶ 6. It is at this point after Gale Force has determined there is damage and now wants to inform the homeowner about the necessity of making a claim for insurance benefits. It is then the state of Florida seeks to jump in and silence Gale Force's speech. Gale Force is prevented from giving its professional advice to a homeowner as to how they may be able to pay for work needed to their home. *See* Second Affidavit of Alexander Dewey at ¶ 8.

There can be no more doubt. The Supreme Court and Eleventh Circuit have made clear this Court must apply strict scrutiny to the Act. And it cannot survive that review (nor does Defendant even attempt to explain how it might).

## B. Post-*Reed* Content-Based Restrictions are Subject to Strict Scrutiny

Despite Defendant's impressive string cite, the case law simply does not support its argument that *Central Hudson* has application post-*Reed* on content-based restrictions. As Judge Wilson explained in his concurrence to the Court's *Wollschlaeger* en banc opinion (reiterating the position he took in the three (3) prior panel decisions), when a statute imposes content-based restrictions on speech is it automatically subject to strict scrutiny. *Wollschlaeger*, 848 F.3d at 1324 (Wilson, J. concurring). Judge Wilson noted the shift in First Amendment jurisprudence brought about by *Reed* and the impact it would have ultimately solidifying protections for First Amendment rights. *Id.* at 1325. Only when courts consistently apply strict scrutiny will courts prevent "official suppression of ideas" and government "hostility–or favoritism" to the ideas being conveyed. *Id.*; see also *Brickman v. Facebook, Inc.*, 230 F. Supp. 3d 1036, 1043 (N.D. Cal. 2017) (applying *Reed* to determine if the telephone consumer protection act was an unconstitutional content-based restriction on Facebook's speech – sending text message advertisements to consumers).

The Sixth Circuit has likely the most detailed analysis of post-*Reed* implications on commercial speech. *Int'l Outdoor, Inc. v. City of Troy, Michigan*, 974 F.3d 690, 703 (6th Cir. 2020). In its analysis of each circuit and district court that has addressed this issue, it noted there was seemingly a reticence to confront the issue head-on. *Id.* In fact, many courts passed over the question of whether strict scrutiny applied preferring to use intermediate scrutiny instead. *Id.* It then followed that if a statute or regulation could not satisfy intermediate scrutiny it would also fail more exacting review.

But the Sixth Circuit dove into the inquiry. It left nothing uncertain. It made apparent that post-*Reed* all content-based restrictions on speech, even those involving commercial speech, are subject to strict scrutiny. *Id.* Focusing on the plain language of *Reed* and the Supreme Court's decisions post-*Reed*, it determined intermediate scrutiny is only applicable to "a speech regulation that is content-neutral on its face." *Id.* Not only does the plain text of *Reed* compel this analysis, but post-*Reed* the Supreme Court in *Barr v. American Association of Political Consultants* "repudiated the approach taken earlier by some of the circuit courts" and instructs lower courts that "strict scrutiny applies to content-

based restrictions." *Id.* at 706. The Sixth Circuit used no uncertain terms: "[t]he Supreme Court has flatly confirmed the requirement to apply *Reed*'s strict-scrutiny standard . . . ." *Id.*

Defendant's reliance on the Fifth Circuit's opinion in *Reagan Nat'l Advertising of Austin, Inc. v. City of Austin*, 972 F.3d 696, 709 (5th Cir. 2020), is misplaced. The Fifth Circuit actually applied *Reed* and reviewed the City's regulations under strict scrutiny, ultimately finding them to be invalid as content-based restrictions lacking narrow tailoring to achieve a compelling government interest. *Id.* Indeed, it was on that point Austin sought certiorari review (the Fifth Circuit applied *Reed* to broadly) and the Supreme Court granted the petition. *Austin, TX v. Reagan Nat. Advert.*, 20-1029, 2021 WL 2637836, at *1 (U.S. June 28, 2021).

The Supreme Court's decision in *Reed* and its post-*Reed* decisions (including *Barr*) have made clear strict scrutiny is the standard this Court must apply when the statute in question in content-based, even if the Act is a regulation of commercial speech.

## III.  The Act Does Not Satisfy Intermediate Scrutiny

Even if this Court were to evaluate the Act through the *Central Hudson* lens, the Act still fails. Since Defendant seemingly agrees there

is nothing "unlawful" or misleading" about Gale Force's speech, it only remains whether Defendant's restrictions are "narrowly drawn" to "directly and materially advance" a "substantial interest" *See* Response, p. 14) (quoting *Fla. Bar. v. Went for It*, 515 U.S. 618, 623 (1995)). Looking at each in turn.

### A.   The Act Lacks any "Substantial State Interest"

Defendant asserts one "interest" the state of Florida is pursuing with this legislation – reducing insurance claims for roof repairs "that often never get completed and were not necessary in the first place." *See* Response, p. 16. This is truly the aim of the Act – preventing insurance claims for roof damage from being filed. Such is simply not a substantial ***state*** interest. While it is likely high on the priority list for Florida's insurance carriers – the state of Florida has no interest in determining whether homeowners file valid claims. Of course, preventing insurance ***fraud*** is a compelling interest, but Defendant candidly admits that is really not the true aim of this statute and the Act's primary sponsors resoundingly agreed. The point of the Act is to slow and stop roofing claims, regardless of whether the claim is covered under the policy.

Laws targeting so-called "cottage industries" are nothing new and their constitutionality remains suspect. For instance, Texas targeted

chiropractors and prohibited soliciting consumers that had pre-existing condition or were involved in an accident. *Bailey v. Morales*, 190 F.3d 320, 321 (5th Cir. 1999). Although that statute (unlike the Act before this Court) exempted communication by a friend or family member, advice from an attorney, or recommendation from a qualified nonprofit. *Id.* Accepting Texas' "strong interests" of protecting vulnerable consumers and upholding the reputations of the profession, the Fifth Circuit turned to whether the statute "materially and directly" advanced those goals. *Id.* at 323. It did not. Texas argued it was "common sense" that its speech-restraint advanced its interests – but the Fifth Circuit determined that was simply not enough. *Id.* at 324. The broad ban on chiropractor's speech was not supported by self-serving declarations by legislators, nor was it supported by claims that chiropractors conduct was likely to cause overreaching and "other misconduct." *Id.* The ban was simply too broad and swept up too much protected speech without showing how exactly it would accomplish its goals. The Fifth Circuit held the restraint on speech was not justified and declared the statute unconstitutional. *Id.* at 326.

Reducing the number of valid insurance claims was the Legislature's goal for the Act and it is simply insufficient to satisfy its

requirement to show a "substantial interest." But, even if this Court accepts that interest at face value, Defendant cannot show how the Act directly advances that goal in a manner that is not more extensive than necessary.

### B.   The Act does not "Directly Advance" a Legitimate Government Interest

This *Central Hudson* prong "requires that the speech restriction directly and materially advance the asserted governmental interest." *Greater New Orleans Broad. Ass'n v. U.S.*, 527 U.S. 173, 188 (1999). As discussed above, Defendant begins with an entirely unsupported premise – nearly 10% of property insurance claims contain some sort of fraud – and then suggests the state of Florida acted reasonably by making it more difficult for consumers to file ***any*** claim in order to prevent those 10% (if it is really that high) of claims. Of course, the flip side is also true – 90% of residential property claims filed are valid claims that involve no fraud, and it will now be unlawful for a contractor to assist that 90% with filing a legitimate claim for covered damage. The Act's overbreadth sweeps up these valid claims to target the alleged 10% of "fraud" claims.

Defendant suggests it is common sense that preventing contractors from communicating to insureds will stop insurance fraud in its tracks,

but there is no data given to support its analysis. Indeed that "common sense" approach was the rationale rejected by the Fifth Circuit in *Bailey*. Defendant must show some evidence that its substantial interest will be materially aided by its restrictions.

It simply cannot. Insurance companies remain free to deny any invalid or fraudulent claim that is submitted. Nothing about this Act will meaningfully stop a fraudulent claim. The Act does not even speak to the difference between a valid claim or a fraudulent one. Even taking Defendant's cramped reading of the Act as true, the Act will purportedly prevent insurance fraud by not permitting contractors to communicate in writing to specific homeowners. Incredibly, this rampant fraud will somehow still be squashed despite contractor's (again, assuming Defendant's reading is true) being able to communicate the exact same message verbally, on the radio, on television, billboards, and the like. It stretches reason to imagine how such a restriction on speech will actually do anything to accomplish its stated goal.

### C.    Not More Extensive Than Necessary

"[I]f the First Amendment means anything, it means that regulating speech must be a last--not first--resort." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 373 (2002). "[I]f the Government could achieve its interests

in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Id.* at 371—72 (striking down a restriction on prescription drug advertising); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) (striking down restriction on advertising the price of alcoholic beverages partly because "[i]t is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal"); *Greater New Orleans Broad. Ass'n*, 527 U.S. at 192 ("There surely are practical and nonspeech-related forms of regulation . . . that could more directly and effectively alleviate . . . the social costs of casino gambling.").

The Eleventh Circuit addressed a similar restriction on advertising–the use of the phrase "skim milk"–that was prohibited unless the milk had the same vitamin content as whole milk. *Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1233 (11th Cir. 2017). The Eleventh Circuit assumed (without deciding) the state had a legitimate interest in preventing milk fraud but determined the statute still failed since the state had other less burdensome alternatives. *Id.* at 1240. The Court noted in free speech cases–more speech is better, not less. *Id.* (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 375 (1977)). The state could have simply

required truthful disclosures about the vitamin content in the milk. *Id*. Or other similar means to get the information to consumers the state felt was necessary to prevent fraud. In addition, the state could not show its restriction was "not more extensive than necessary to serve its interest" since it plainly had other avenues to accomplish its goals as opposed to a complete ban on truthful speech. *Id*.[4]

Likewise, here, the state could more aggressively prohibit insurance fraud and impose licensure penalties for any contractor engaged in such. The state could require disclosures (as it presently does in many instances) of consumer's rights and legal protections (e.g., § 627.7152 describing the 18-point font disclosures that must be provided to consumers in an assignment of post-loss insurance benefits). The state could also more aggressively pursue insurance fraud prosecutions and assist insurance companies in denying these invalid claims. But this Act does none of that. It targets actors the Legislature disfavored and singled them out for special

---

[4] Again, as in *Wollschlaeger*, the Eleventh Circuit refused to confront the issue of whether *Central Hudson* applied to content-based restrictions post-*Reed*. *Ocheesee Creamery LLC*, 851 F.3d at 1235 n.7. Since the parties had not briefed that issue (and the statute could not survive intermediate scrutiny) the Court found it unnecessary to reach that issue. Of course, as discussed above, the Eleventh Circuit then resolved that issue in *Otto*.

treatment–silencing their speech. Such is plainly "more extensive than necessary to serve its interest."

## IV. First Amendment Violation Automatically is Irreparable Harm and Outweighs any State or Public Interest

Defendant is simply wrong in its assertions about irreparable harm. Gale Force has alleged irreparable harm in its inability to communicate things it would have communicated but for the Act. Gale Force may no longer send the advertisement it previously sent to homeowners offering its services in exchange for insurance proceeds that may be payable. *See* Second Affidavit of Alexander Dewey, at ¶ 7, A-1, and A-2. Specifically, Mr. Dewey explained how Gale Force (due to the Act) will self-censor and not be able to "advertise" and "communicate" as it had done previously. *See* Second Affidavit of Alexander Dewey, at ¶ 10. To say that amounts to simply a business interruption or monetary damage claim ignores the fact it is the limit on Gale Force's speech which is the ultimate cause of the problem and the basis of the injury.

This Court has recently addressed this issue and determined that once the Court determines the Act is a First Amendment violation, the element of irreparable harm and balance of public interest nearly automatically are met. *NetChoice, LLC*, 2021 WL 2690876, at *11 ("When

a plaintiff is likely to prevail on the merits of a First Amendment claim, these other prerequisites to a preliminary injunction are usually met.") (citing *Otto*, 981 F.3d at 870); see also *The American Civil Liberties Union of Florida, Inc.,* Case No. 4:21-cv-190-AW-MJF at * 16 ("[H]arms to speech rights for even minimal periods of time, unquestionably constitute irreparable injury supporting preliminary relief.") (citations omitted).

Gale Force has shown it will suffer irreparable harm absent injunctive relief and Defendant has no sufficient interest to restrict First Amendment-protected speech since there is "no [public] interest in enforcing an unconstitutional law." *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). Accordingly, Gale Force satisfies these requirements.

## CONCLUSION

The Act is a clear example of the Legislature putting its thumb on the scale in favor of one industry over another. While insurance fraud should be punished (along with unlicensed public adjusting) the Act does not speak to that. The Act is a content-based restriction on a particular class of individuals that would prohibit them from conveying truthful information to homeowners. This Act fails constitutional scrutiny (under either test). This Court should preliminarily enjoin the Act.

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1, I hereby certify that this Reply to Defendant's Response in Opposition to Amended Motion for Preliminary Injunction, relying on the word-processor system calculation, contains 4,251 words and therefore does not exceed 8,000 words, excluding the case style, signature block, and certificate of service.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on July 8, 2021, a true and correct copy of the foregoing was filed with the Clerk of Court using the CM/ECF portal, which will serve all counsel of record.

WEBER, CRABB & WEIN, P.A.

*/s/ Jeremy D. Bailie*
Jeremy D. Bailie, Esquire
FBN: 118558
Primary: jeremy.bailie@webercrabb.com
Secondary: lisa.willis @webercrabb.com
Kyle D. Bass, Esquire
FBN: 122158
Primary: kyle.bass@webercrabb.com
Secondary: sandra.peace@webercrabb.com
Joseph P. Kenny, Esq.
FBN: 59996
Primary: joseph.kenny@webercrabb.com
Secondary: sandra.peace@webercrabb.com
5453 Central Avenue
St. Petersburg, Florida 33710
Phone No.: (727) 828-9919
Fax No.: (727) 828-9924