# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### TALLAHASSEE DIVISION

**GALE FORCE ROOFING &
RESTORATION, LLC,**

   *Plaintiff,*

**v.**            **Case No.:  4:21cv246-MW/MAF**

**JULIE I. BROWN, in her official
capacity as Secretary of the Florida
Department of Business and
Professional Regulation,**

   *Defendant.*

_____/

## PRELIMINARY INJUNCTION[1]

 This Court finds itself in the eye of the storm of Florida's most recent attempt

to regulate the business practices of contractors. Specifically, Plaintiff Gale Force

Roofing & Restoration, LLC, moves for a preliminary injunction enjoining

Defendant Secretary of the Florida Department of Business and Professional

Regulation ("DBPR" or "the Department") from enforcing section 489.147, Florida

Statutes. This Court set an expedited briefing schedule with respect to Plaintiff's

---

[1] Governor DeSantis signed the challenged law on June 11, 2021. Ten days later, on June 21, 2021, Plaintiff filed its complaint, ECF No. 1, and the next day its motion for preliminary injunction, ECF No. 4. This Court set the matter for an expedited hearing, but in reviewing the pleadings, this Court determined it lacked subject-matter jurisdiction and dismissed Plaintiff's complaint without prejudice. *See* ECF No. 17. Plaintiff promptly filed a first amended complaint and amended motion for preliminary injunction, ECF Nos. 19 & 20, and this Court set the matter for an expedited briefing and hearing schedule, ECF No. 24. This Order follows the hearing on the amended motion.

motion and held an in-person preliminary injunction hearing on July 9, 2021. This Court has considered Plaintiff's motion, ECF No. 20, Defendant's response, ECF No. 25, Plaintiff's reply, ECF No. 26, all attachments, and the arguments both parties presented at the hearing on the motion.

The issue in this case is whether the new law's ban on written or electronic communication that encourages, induces, or instructs someone to contact a contractor or public adjuster for the purpose of filing an insurance claim for roof damage violates the First Amendment.[2] Plaintiff alleges the law violates the First Amendment on its face. In short, Plaintiff claims the law amounts to a content-based restriction on speech, is presumptively unconstitutional, and fails strict scrutiny review. In the alternative, Plaintiff asserts the law fails intermediate scrutiny review as a regulation on commercial speech.[3]

---

[2] "The First Amendment prohibits the political restriction of speech in simple but definite terms: 'Congress shall make no law . . . abridging the freedom of speech.' " *Otto v. City of Boca Raton, Fla.*, 981 F.3d 854, 860 (11th Cir. 2020) (quoting U.S. Const. amend. I)). "Those same terms, and their guarantee of free speech, now apply to states and municipalities as well as to the federal government." *Id*. at 860-61 (citation omitted).

[3] "Commercial speech is 'expression related solely to the economic interests of the speaker and its audience.' " *Edward Lewis Tobinick, MD v. Novella*, 848 F.3d 935, 950 (11th Cir. 2017) (quoting *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 561 (1980)). "The 'core notion' of commercial speech extends to speech that proposes a commercial transaction." *Id*. (quoting *Bolger v. Young Drug Prods. Corp.*, 463 U.S. 60, 66 (1983)). "The Supreme Court has identified three factors in looking beyond the core notion of commercial speech: (1) that the material was 'conceded to be advertisements,' (2) it contained a 'reference to a specific product,' and (3) the speaker 'has an economic motivation' for distributing the material." *Id*. (quoting *Bolger*, 463 U.S. at 66). "No one factor is dispositive." *Id*. But, "[t]he combination of all three characteristics . . . provides strong support for the conclusion that the material is properly characterized as commercial speech." *Id*. Here, Plaintiff's communications with homeowners—

On the other hand, Defendant asserts the new law is not subject to strict scrutiny review and survives intermediate scrutiny as a reasonable restriction on commercial speech combating consumer exploitation and fraud, "ensuring that the line between contractor and insurance adjuster is not blurred," and protecting Florida homeowners from "skyrocketing insurance premiums, or, worse, the inability to secure homeowner's insurance at all." ECF No. 25 at 14-17.

This Court agrees with Defendant that intermediate scrutiny applies to the law at issue. However, this Court finds that it fails this less-onerous test. To be clear, this Court recognizes that the State of Florida has a valid and weighty interest in regulating contractors and protecting Floridians from fraud, exploitation, and the deleterious effects that fraud and exploitation have on the insurance market in Florida. And it is within the Legislature's purview to address these concerns. But it must do so within the bounds set by the Constitution.[4] Here, the Legislature failed

---

namely, its written advertisements—constitute commercial speech. In addition, Defendant is tasked with enforcing the challenged provision which explicitly prohibits certain advertising and therefor targets constitutionally protected commercial speech.

[4] The Legislature has already crossed the constitutional boundary line in two recent cases, albeit with respect to distinguishable First Amendment claims that did not implicate the *Central Hudson* test. *See, e.g.*, *NetChoice, LLC v. Moody*, No. 4:21cv220-RH-MAF, 2021 WL 2690876 (N.D. Fla. June 30, 2021) (preliminarily enjoining Defendants from enforcing portions of state law that violated First Amendment); *see also Am. Civil Liberties Union of Fla. Inc. v. Lee, et al.*, ECF No. 38, No. 4:21cv190-AW/MJF (N.D. Fla. July 1, 2021) (preliminarily enjoining members of Florida Elections Commission from enforcing state law that violated First Amendment).

to do so. Accordingly, Plaintiff's motion for preliminary injunction, ECF No. 20, is **GRANTED**.

## I

First, some background information is helpful. This action implicates the Department's regulatory framework governing the contracting profession in Florida. Accordingly, this Court will lay the foundation with a brief description of that framework. Next, this Court will sketch out the blueprint for the new law, which Plaintiff claims violates the First Amendment. Finally, this Court will address Plaintiff's factual allegations concerning the speech it alleges the new law prohibits.

## A

Florida's Legislature deems it necessary for the public health, safety, and welfare of its citizens to regulate the construction industry. *See* § 489.101, Fla. Stat. To that end, the State has implemented professional licensing requirements to operate as a contractor in Florida. *See* § 489.113(1), Fla. Stat. (requiring certification to engage in contracting on a statewide basis or registration to engage in contracting "on other than a statewide basis"). The Department oversees these licensing requirements, *see id*. § 489.111(1) ("Any person who desires to be certified shall apply to the department in writing."), and enforces its regulations by issuing cease and desist orders and instituting disciplinary proceedings against licensed contractors, *see e.g.*, §§ 489.113(2)(a) & (4)(d), Fla. Stat. Disciplinary penalties can

include administrative fines, reprimands, probation, suspension, and revocation of a licensed contractor's certification or registration. § 489.129(1), Fla. Stat.

In addition to regulating licensed contractors, the Department investigates and enforces licensing requirements against unlicensed contractors. *See* § 489.130, Fla. Stat. Disciplinary action can include fines up to $10,000 per violation and being included on the Department's webpage "dedicated solely to listing any known information concerning unlicensed contractors." *Id*. §§ 489.130(3), (6).

The Florida Legislature has outlawed several false or fraudulent business activities, including to falsely hold oneself out as or falsely impersonate a licensed contractor, to present the credentials of another contractor as one's own, to knowingly give false or forged evidence to the licensing board, or to use or attempt to use a license that has been suspended or revoked. *See* § 489.127(1), Fla. Stat. Any unlicensed person who violates these provisions commits an enhanceable offense— in other words, the penalties escalate following the first conviction. Specifically, a first offense constitutes a first-degree misdemeanor, punishable by up to eleven months and 29 days in county jail and a $1,000 fine. *Id*. § 489.127(2)(a). A second offense—following conviction for the first offense—constitutes a third-degree felony, punishable by up to five years in state prison and a $5,000 fine. *Id*. § 489.127(2)(b). In addition, Florida has criminalized insurance fraud, *see* § 817.234, Fla. Stat., which consists of, among other things, presenting any written

or oral statement as part of a claim for payment, knowing that such statement contains false, incomplete, or misleading information concerning any fact or thing material to such claim, *id.* § 817.234(1)(a).

B

During the 2021 legislative session, the Florida Legislature passed a new law that prohibits speech encouraging someone to contact a contractor or public adjuster for purposes of filing an insurance claim for roof damage. *See* Ch. 2021-77, § 1, Laws of Fla. Governor DeSantis signed the bill into law on June 11, 2021. And it went into effect on July 1, 2021, creating section 489.147, Florida Statutes, which provides in pertinent part:

489.147 Prohibited property insurance practices:

(1) As used in this section, the term:

(a) "Prohibited advertisement" means any written or electronic communication by a contractor that encourages, instructs, or induces a consumer to contact a contractor or public adjuster for the purpose of making an insurance claim for roof damage. The term includes, but is not limited to, door hangers, business cards, magnets, flyers, pamphlets, and e-mails.

(b) "Soliciting" means contacting:

1. In person;

2. By electronic means, including, but not limited to, e-mail, telephone, and any other real-time communication directed to a specific person; or

3. By delivery to a specific person.

§ 489.147(1)(a)-(b), Fla. Stat.

The law prohibits any "contractor" from "directly or indirectly" "soliciting a residential property owner by means of a prohibited advertisement." *Id*. § 489.147(2)(a). "A contractor who violates this section is subject to disciplinary proceedings" and "may receive up to a $10,000 fine for each violation of this section." *Id*. § 489.147(3). The law also decrees that any "unlicensed person" who engages in prohibited speech is guilty of "unlicensed contracting," and subject to civil penalties through Department disciplinary action and fines up to $10,000 per violation. *Id*. § 489.147(4)(b).

Accordingly, licensed contractors are not allowed to encourage, instruct, or induce any consumer to contact a contractor or public adjuster for the purpose of making an insurance claim for roof damage by written or electronic means—and neither is any "unlicensed person." In-person, oral communication of this message does not appear to violate the law as written.[5] However, this law effectively bans

---

[5] Plaintiff has argued in its papers and at the hearing that section 489.147(4)(b), which prohibits any "unlicensed person" from engaging in acts prohibited by section 489.147, can plausibly be read to prohibit covered speech by any member of the general public in Florida. For example, in the wake of a damaging hurricane, one need not fear a $10,000 fine or criminal prosecution for engaging in "unlicensed contracting" in the event she orally encourages her neighbor to contact a roofer for the purpose of filing an insurance claim. However, Plaintiff argues, based on the plain language of the new law, the same may not be true if that individual calls, texts, or emails her neighbor to communicate the same message via "electronic communication." While this Court understands Plaintiff's argument, the statute could also be read to prohibit actors who already engage in "unlicensed contracting," under section 489.13(1), from engaging in additional prohibited acts set out in section 489.147. In other words, the challenged law may be read to expand the scope of what constitutes "unlicensed contracting," in the context of how "unlicensed contracting" has already been defined under section 489.13. Reading section (4)(b) in this way

this specific message by contractors—licensed or not—in written or electronic form in the state of Florida.

C

Plaintiff asserts the challenged law effectively derails its current business practices and bars it from providing truthful information to consumers. *See* ECF No. 20-1 ¶ 12 ("Gale Force will have to stop communicating to homeowners accurate, truthful information about the availability of insurance coverage for the work Gale Force stands ready to perform."). Specifically, Alexander Dewey, Plaintiff's authorized representative, provided an affidavit attesting to Plaintiff's business practices, which include "repairing homes (mainly roof systems) that have been damaged by hurricanes or other natural disasters in the state of Florida." *Id*. ¶ 4. "Gale Force advertises to homeowners in the state of Florida that it is willing to inspect property (mainly the roof system) that has been damaged by hurricanes or other natural disasters and advises it will accept the insurance proceeds as payment for its services repairing that damaged property." *Id*. ¶ 6. After completing

---

permits the reasonable conclusion that the statute is not actually intended to swallow up any written or electronic communication that could arguably meet the definition of a "prohibited advertisement" when the speaker is not otherwise engaging in "unlicensed contracting." This Court is mindful of Justice Story's admonition that "[n]o court ought, unless the terms of an act rendered it unavoidable, to give a construction to it which should involve a violation, however unintentional, of the constitution." *Parsons v. Bedford, Breedlove & Robeson*, 28 U.S. 433, 448-49 (1830). For this reason, this Court will not adopt a construction of section 489.147(4)(b) that renders that section unconstitutional as such a construction can be avoided. With that said, however, the same is not true with respect to the plain terms of sections 489.147(2)(a), and (3).

inspections, Gale Force contacts homeowners "and offers to enter into a contract assigning to Gale Force the insurance proceeds payable under a residential insurance policy in exchange for Gale Force performing the necessary remedial work." *Id*. ¶¶ 8-9.

Plaintiff has attached to its motion for preliminary injunction a copy of one of its printed advertisements and a copy of a proposed assignment of benefits contract that it offers to prospective clients. ECF No. 20-1 at 4-9. The printed advertisement appears to be a "door hanger" with text that encourages consumers to call Plaintiff for a free inspection. The door hanger notes that (1) the consumer "may qualify for a new roof," (2) their "roof may have storm damage from hail/wind," and (3) this same damage may be covered by insurance. *Id*. An image of the door hanger is reproduced below.



*Id.*

II

Before addressing the merits of the motion for preliminary injunction, this Court must address three threshold questions. The first is whether Plaintiff has standing. The second is whether this case is fit for pre-enforcement review. And the third is whether Defendant is a proper party before this Court.

A

At this juncture, Defendant does not argue that Plaintiff lacks standing, but it remains a threshold matter that this Court must determine before proceeding to consider the merits of Plaintiff's claim. *E.g.*, *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262 (11th Cir. 2006). To establish standing, a plaintiff must prove he has suffered (1) an injury-in-fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992). This Court first addresses whether Plaintiff has established an injury-in-fact.

The Eleventh Circuit has applied "the injury-in-fact requirement most loosely where First Amendment rights are involved, lest free speech be chilled even before the law or regulation is enforced." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1254 (11th Cir. 2010) (citing *Hallendale Prof'l Fire Fighters Local 2238 v. City of Hallendale*, 922 F.2d 756, 760 (11th Cir. 1991)). Specifically, "it is well-established that 'an actual injury can exist when the plaintiff is chilled from exercising her right

to free expression or foregoes expression in order to avoid enforcement consequences.' " *Id*. (quoting *Pittman v. Cole*, 267 F.3d 1269, 1283 (11th Cir. 2001)). In such cases, "the injury is self-censorship." *Pittman*, 267 F.3d at 1283; *see also Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1305 (11th Cir. 2017) ("Where the 'alleged danger' of legislation is 'one of self-censorship,' harm 'can be realized even without an actual prosecution.' ") (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)); *cf. Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1381-82 (11th Cir. 2019) (holding strip club lacked standing to pursue First Amendment claim because it was undisputed that the club was not self-censoring, but instead it was continuing to carry on its business in apparent compliance with the challenged ordinance).

Here, Plaintiff alleges it is a licensed contractor subject to section 489.147, Florida Statutes. Plus, Plaintiff asserts, and its attachments show, that it engages in advertising and other communications that fall within the new definition of "prohibited advertisement" under section 489.147(1)(a). Putting that together, Plaintiff alleges the law chills its First Amendment rights because, under pain of disciplinary action, it forces Plaintiff to cease its written advertising that encourages consumers to contact it for the purpose of filing an insurance claim for roof damage.

Plaintiff's allegations and supporting evidence show that "but for [section 489.147], [it] would engage in speech arguably protected by the First Amendment."

*Wollschlaeger*, 848 F.3d at 1305. Accordingly, Plaintiff is engaging in self-censorship by refraining from advertising that arguably runs afoul of the new law. These facts are sufficient to establish an injury-in-fact that is "concrete and particularized," and an "actual or imminent" legally cognizable harm. *See Dana's R.R. Supply v. Atty. Gen., Fla.*, 807 F.3d 1235, 1241 (11th Cir. 2015).

The next issue is whether Plaintiff's injury is fairly traceable to Defendant. Plaintiff's self-censorship in the face of imminent prosecution is fairly traceable to Defendant because, as explained below, Defendant is responsible for investigating alleged violations of the challenged law and has the power to initiate disciplinary proceedings resulting from those violations. *Cf. Lewis v. Governor of Ala.*, 944 F.3d 1287, 1299 (11th Cir. 2019) (addressing traceability and noting the law at issue did not provide for an "enforcement mechanism whatsoever, and it certainly envision[ed] no role for the [named defendant]").

Finally, Plaintiff has shown that its requested relief, a court order declaring the challenged portions of the law unconstitutional and enjoining Defendant from enforcing them, can redress the above-described injury. Plaintiff alleges that Defendant, in her official capacity as Secretary of the Department, is the individual charged with enforcing section 489.147. ECF No. 19 ¶ 46. Plaintiff is right. Section 489.147(3) states that "[a] contractor who violates this section is subject to disciplinary proceedings as set forth in s. 489.129." § 489.147(3), Fla. Stat.

Disciplinary proceedings are within the jurisdiction of the Department. *See* § 455.225, Fla. Stat. Moreover, Florida law requires the Department to investigate "any complaint that is filed before it if the complaint is in writing, signed by the complainant, and legally sufficient." § 455.225(1)(a), Fla. Stat. The Department may also "initiate an investigation if it has reasonable cause to believe that a licensee or a group of licensees has violated a Florida Statute, a rule of the department, or a rule of a board." *Id.* Accordingly, this Court is satisfied that an order enjoining the Defendant from taking steps to investigate and prosecute violations of section 489.147 with respect to "prohibited advertisements" can redress Plaintiff's injuries.[6]

For these reasons, this Court finds that Plaintiff has standing. But before proceeding further, this Court must also consider "prudential limitations on the kinds of cases that [this] court has power to decide." *Club Madonna*, 924 F.3d at 1379. Specifically, this Court must determine whether this action is ripe given its pre-enforcement posture. *See Wollschlaeger*, 848 F.3d at 1304.

## B

"In assessing whether a dispute is concrete enough to be ripe, we evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of

---

[6] As discussed below, the fact that the Construction Industry Licensing Board has discretion to impose discipline for specified infractions, *see* § 489.129, Fla. Stat., does not negate the fact that the Secretary is tasked with investigating and prosecuting violations of relevant Florida law, including section 489.147.

withholding court consideration." *Id*. (internal quotation marks omitted). First, as to the "fitness of the issues," this Court "ask[s] whether the parties raise an issue that [this Court] can decide without further factual development and whether the institutional interests of the court and agency favor immediate review." *Club Madonna*, 924 F.3d at 1380 (citations omitted). And as for "hardship," "litigants must show that they are forced to choose between foregoing lawful activity and risking substantial legal sanctions." *Id*. (citations omitted). "If a claim is fit for judicial decision, that is [the] end of the inquiry, and the matter is ripe, given that the absence of a hardship cannot tip the balance against judicial review under those circumstances." *Id*. (citing *Harrell*, 608 F.3d at 1259) (internal quotation marks omitted).

"A facial challenge presenting a purely legal argument . . . is presumptively ripe for judicial review because that type of argument does not rely on a developed factual record." *Id*. at 1380 (citation and internal quotation marks omitted). With respect to the claim before this Court, the parties agreed that further factual development was unnecessary at the preliminary injunction stage and instead decided to rely upon written declarations at the hearing. In addition, the issue presented is essentially a legal question. That is, whether the challenged provision violates the First Amendment on its face. Accordingly, applying the standards the

Eleventh Circuit articulated in *Club Madonna*, this Court concludes that Plaintiff's challenge is ripe for review. Indeed, Defendant has not asserted otherwise.

A related question concerns whether Plaintiff's claim is fit for judicial review given its pre-enforcement posture. "When an individual is subject to the threatened enforcement of a law, an actual arrest, prosecution, or other enforcement action is not a prerequisite to challenge the law." *Wollschlaeger*, 848 F.3d at 1304 (quoting *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2342 (2014)). A person may "bring a pre-enforcement suit when he has alleged an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution." *Id*. (internal quotation marks omitted).

As in *Wollschlaeger*, it is undisputed here that Plaintiff ordinarily engages in arguably constitutionally protected speech—in this case, advertising in written form that arguably encourages consumers to contact Plaintiff for the purpose of filing an insurance claim for roof damage—that it believes runs afoul of the challenged law prohibiting such speech. Plaintiff is therefore choosing to self-censor to avoid discipline by the Department for its "prohibited advertisements." As this Court cited above, "[w]here the 'alleged danger' of legislation is 'one of self-censorship,' harm 'can be realized even without an actual prosecution.' " *Id*. at 1305 (quoting *Am. Booksellers*, 484 U.S. at 393). In this case, but for section 489.147, Plaintiff "would

engage in speech arguably protected by the First Amendment," and, thus, has "satisfied the first prong of the *Driehaus* standard." *Id*.

As for the second prong, this Court must determine whether Plaintiff has "shown a credible threat of prosecution, a standard which [the Eleventh Circuit has] described as 'quite forgiving.' " *Wollschlaeger*, 848 F.3d at 1305 (quoting *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1428 (11th Cir. 1998)). Plaintiff "need cross only a low threshold; the Supreme Court requires no more than a credible threat of prosecution, one that is not chimerical, or imaginary or speculative, [or] some reason for fearing prosecution." *Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 821 (5th Cir. 1979) (internal citations and quotation marks omitted).

Plaintiff must show "that [it] seriously wishes to engage in expression that is at least arguably forbidden by the pertinent law . . . and . . . that there is at least some minimal probability that the challenged rules will be enforced if violated." *Harrell*, 608 F.3d at 1260 (internal quotation marks and citation omitted). Here, Plaintiff has shown a definite and serious wish to engage in arguably forbidden speech. Through its affidavit and attachments, Plaintiff has shown it engages in advertising in written form that arguably encourages consumers to contact Plaintiff for the purpose of filing an insurance claim for roof damage—the exact form and message that section 489.147 prohibits.

And here, like in *Wollschlaeger*, an intent to enforce the challenged law may be inferred. *Wollschlaeger*, 848 F.3d at 1305 (quoting *Harrell*, 608 F.3d at 1257). This is because, just like in *Wollschlaeger*, Plaintiff has challenged the law at issue "soon after it was enacted"—indeed, within two weeks of the Governor putting pen to paper—and Defendant "has since vigorously defended the Act in court." *Id.*; *see also Eaves*, 601 F.2d at 821 ("[T]he ordinance was enacted only months ago and we are probably entitled to assume that law enforcement agencies will not disregard such a recent expression of the legislature's will."). *See, e.g.*, ECF Nos. 13 & 25. The threat of prosecution is neither speculative nor imaginary. Instead, the law prohibits speech and designates a penalty in the event the law is violated, showing more than "some minimal probability that the challenged rules will be enforced if violated." *Harrell*, 608 F.3d at 1260 (internal quotation marks and citation omitted).[7]

---

[7] The Department is generally permitted to issue a declaratory statement dealing with section 489.147's application to a particular contractor's unique set of circumstances. *See* § 120.565, Fla. Stat. Defendant could have argued that Plaintiff's particular advertisement, ECF No. 20-1, does not constitute a "prohibited advertisement," and thus, Plaintiff does not face a credible threat of prosecution. But, based on the record before this Court, the Department has not yet issued a declaratory statement applying the definition of a "prohibited advertisement" to a given set of facts that would give this Court some insight into the Department's view on "prohibited advertisements," nor has Defendant asserted Plaintiff's "door hanger" falls outside the ambit of a "prohibited advertisement." *See also Wollschlaeger*, 848 F.3d at 1306 (noting the court was not persuaded by the agency's letter purportedly clarifying application of the law at issue in the absence of any formal rulemaking or declaratory statement from the agency). In fact, on the record at the hearing, counsel for Defendant asserted the Plaintiff's advertisement indeed qualifies as a "prohibited advertisement" because it explicitly mentions that "Your roof may have storm damage from hail/wind – **damage that INSURANCE covers!**" ECF No. 20-1 at 4 (emphasis in original). According to Defendant, the fact that the advertisement mentions the possibility that potential storm damage is covered by insurance means the speech violates the law. Accordingly,

Accordingly, satisfied that Plaintiff has constitutional standing to proceed and that Plaintiff's claim is justiciable in its pre-enforcement posture, this Court turns to the final question, whether Defendant is a proper party.

C

It is well-established that while a state may not be sued unless it waives its sovereign immunity or that immunity is abrogated by Congress, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000), a suit alleging a constitutional violation against a state official in his or her official capacity for prospective injunctive relief is not a suit against the state and, therefore, does not violate the Eleventh Amendment, *Ex parte Young*, 209 U.S. 123, 161 (1908). That is because "[a] state official is subject to suit in his official capacity when his office imbues him with the responsibility to enforce the law or laws at issue in the suit." *Grizzle v. Kemp*, 634 F.3d 1314, 1319 (11th Cir. 2011). Furthermore, supervisory authority, in and of itself, is insufficient to render state-level Florida authorities' proper defendants. *See generally Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020). Instead, a state official needs to have "some connection" with the underlying claim in the lawsuit. *Id.* at 1256 ("To be a proper defendant under *Ex parte Young*—and so avoid an Eleventh Amendment bar

---

Defendant has provided this Court with no reason to believe that Plaintiff is not in its crosshairs in the event Plaintiff continues distributing its "door hangers" to consumers.

to suit—a state official need only have "some connection" with the enforcement of the challenged law.") (citation omitted).

Defendant does not argue that she is not a proper party. However, for the sake of completeness, this Court will address the issue. As Secretary of the Department, Defendant is the head of the agency that enforces the challenged law by investigating and prosecuting violations thereof, imposing fines, and conducting license suspension and restriction proceedings.[8] *See* §§ 489.129 & 489.13(3), Fla. Stat. As Plaintiff is subject to investigation and prosecution by Defendant for violating the challenged law, Defendant clears the "some connection" hurdle. Defendant is clearly a proper party. Indeed, nobody, not even Defendant, disputes this.

## III

Under Rule 65 of the Federal Rules of Civil Procedure, a district court may grant a preliminary injunction if the movant shows: "(1) it has a substantial likelihood of success on the merits;" (2) it will suffer irreparable injury "unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d

---

[8] Within DBPR exists the Construction Industry Licensing Board, the actions of which "are an exercise of [DBPR's] regulatory power for the protection of public safety and welfare." *See* §§ 489.107 & 489.1401, Fla. Stat. The Board may hear disciplinary proceedings for a violation of the challenged law by a contractor. However, it is the Department that, among other things, investigates complaints and prosecutes violations before the Board.

1163, 1176 (11th Cir. 2000) (en banc). Although a "preliminary injunction is an extraordinary and drastic remedy," it nonetheless should be granted if "the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cnty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)). None of these elements, however, is controlling; rather, this Court must consider the elements jointly, and a strong showing on one element may compensate for a weaker showing on another. *See Fla. Med. Ass'n, Inc. v. U.S. Dep't of Health, Educ., & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979).

"Although the initial burden of persuasion is on the moving party, the ultimate burden is on the party who would have the burden at trial." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (citing *Edenfield v. Fane*, 507 U.S. 761, 770 (1993)). The party seeking to uphold a restriction on commercial speech—in this case, the Defendant—carries the burden of justifying it. *Edenfield*, 507 U.S. at 770 (quoting *Bolger*, 463 U.S. at 71 n.20).[9]

---

[9] Defendant emphasizes that the burden of persuasion rests with Plaintiff as to establishing each of the preliminary injunction factors under Rule 65. ECF No. 25 at 9 n.6. But in determining whether Plaintiff has shown a substantial likelihood of success on the merits, this Court must also consider whether "the State will ultimately fail to prove its regulation is constitutional." *Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009) (citing *Ashcroft v. Am. Civil Libs. Union*, 542 U.S. 656, 666 (2004)). Accordingly, once Plaintiff has met its burden of persuasion as to the substantial likelihood that the challenged law impermissibly restricts commercial speech in violation of the First Amendment, Defendant must come forward to show "its ability to justify the statute['s] constitutionality." *Id*.

A

This Court begins with whether Plaintiff has shown a substantial likelihood of success on the merits. This Court addresses this Rule 65 factor first, because "[i]f the movant is unable to establish a likelihood of success on the merits, a court need not consider the remaining conditions prerequisite to injunctive relief." *Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (citing *Pittman*, 267 F.3d at 1292).

Plaintiff asserts portions of section 489.147 violate the First Amendment as content-based restrictions on speech. In the alternative, Plaintiff argues that the law impermissibly prohibits commercial speech in violation of the First Amendment.[10]

---

[10] Plaintiff asserts the proper standard of review this Court should apply to the challenged law is strict scrutiny, citing the Supreme Court's uncompromising view of content-based restrictions in *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) and *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 140 S. Ct. 2335 (2020). ECF No. 20 at 12-13. However, the Eleventh Circuit has pointed out that restrictions on lesser-protected categories of speech, like the commercial speech at issue in this case, may not fall under this heightened standard of review, even when those restrictions are content-based. *See Ocheesee Creamery LLC v. Putnam*, 851 F.3d 1228, 1235 n.7 (11th Cir. 2017) (discussing whether "an analysis to determine if the restriction is content based or speaker focused must precede any evaluation of the regulation based on traditional commercial speech jurisprudence, and if so, whether this would alter the *Central Hudson* framework," but declining to resolve the issue because the challenged law could not even survive intermediate scrutiny). Nonetheless, Plaintiff asserts the Eleventh Circuit recently set the record straight in *Otto*, where the Court applied strict scrutiny to the City's ban on "controversial therapies called sexual orientation change efforts"—also known as conversion therapy. 981 F.3d at 859. But *Otto* provides little support for Plaintiff's assertion that strict scrutiny applies here, where commercial speech is at issue. Specifically, in *Otto*, the City defended its challenged ordinance in part by arguing that the therapists' speech fell into a category of lesser-protected or unprotected speech, like commercial speech. But the Eleventh Circuit rejected this argument and made plain that "what is being regulated is not, say, an advertisement for therapy, but the therapy itself. No one argues that commercial speech is at issue." *Id*. at 865. In so stating, the Eleventh Circuit apparently implied that had a content-based regulation of advertisements for therapy been at issue, rather than a content-based regulation of the therapy itself, a different standard of review might have applied.

This Court finds that Plaintiff has shown a substantial likelihood of success on the merits in that the challenged law fails intermediate scrutiny under *Central Hudson*.

1. *The* Central Hudson *Test for Commercial Speech*

In *Central Hudson*, the Supreme Court developed an intermediate scrutiny test for regulations of commercial speech that consists of four questions. Because the "First Amendment's concern for commercial speech is based on the informational function of advertising," 447 U.S. at 566, the first question is whether the speech at issue is false, misleading, or concerns unlawful activity, *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002). If the answer is yes, the speech is not protected by the First Amendment and the government has free rein to regulate it. *Id.*

If the speech is not false, misleading, or concerning illegal activity, the second question is "whether the asserted governmental interest is substantial." *Cent. Hudson*, 447 U.S. at 566. If the government does not assert a substantial interest, the inquiry ends, and the regulation is unconstitutional. *See id.*; *Thompson*, 535 U.S. at 367.

---

But in the end, here, much like in *Ocheesee Creamery*, this Court "need not wade into these troubled waters," because the challenged portions of section 489.147 cannot survive "*Central Hudson* scrutiny," let alone strict scrutiny. *Ocheesee Creamery*, 851 F.3d at 1235 n.7.

Should the government advance a substantial interest, the third question is whether the regulation directly advances that asserted interest. *Cent. Hudson*, 447 U.S. at 564. The answer must be in the affirmative for the regulation to survive, as it "may not be sustained if it provides only ineffective or remote support for the government's purpose." *Id.*

Finally, if the regulation directly advances the government's substantial interest, this Court must ask "if the governmental interest could be served as well by a more limited restriction on commercial speech." *Id.* Only if the regulation is "not more extensive than is necessary to serve" the government's substantial interest can this Court sustain the regulation as constitutional. *Thompson*, 535 U.S. at 367. This last question reflects the First Amendment's mandate "that speech restrictions be 'narrowly drawn' . . . The regulatory technique may extend only so far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest . . . ." *Cent. Hudson*, 447 U.S. at 565 (citations omitted).

The third and fourth questions of the *Central Hudson* test work together to "ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 572 (2011).

### 2. Central Hudson *Applied*

#### i. Is the speech at issue false, misleading,
#### or concerned with illegal activity?

The first *Central Hudson* question is easily resolved here. Where the statute

defines "prohibited advertisements" and "soliciting," it does not indicate that its

prohibition applies only to speech that is misleading, fraudulent, or concerning

illegal activity. *See* § 489.147, Fla. Stat; *Cent. Hudson*, 447 U.S. at 566. Defendant

does not argue otherwise. *See* ECF No. 25. And at the hearing, Defendant explicitly

conceded that speech encouraging consumers to contact a contractor or public

adjuster for the purpose of filing an insurance claim for roof damage is not false,

misleading, or concerned with illegal activity. Accordingly, this Court finds that the

regulation at issue is subject to intermediate scrutiny as laid out in *Central Hudson*.

#### ii. Are the State's asserted interests substantial?

This Court turns next to *Central Hudson*'s second question; namely, whether

the asserted governmental interest is substantial. Defendant claims several

substantial interests support section 489.147's prohibition on certain advertising.

These interests are regulating licensed contractors, preventing consumer exploitation

and fraud, "ensuring that the line between contractor and insurance adjuster is not

blurred," and protecting Florida homeowners from rising insurance costs. ECF No.

25 at 14-17. Plaintiff does not seriously dispute the validity of these asserted interests.[11]

As further evidence of the State's substantial interests, Defendant asks this Court to take judicial notice of information available from the Office of the Florida Insurance Consumer Advocate. ECF No. 25 at 2 n.2. This office was established by the Florida Legislature in 1992 and serves as an independent advocate for "the best interests of Florida consumers" by "propos[ing] solutions to insurance issues" and by working with a wide range of stakeholders. *Id.* at 3 n.3. Just this past spring, the Insurance Consumer Advocate launched a public campaign to prevent insurance fraud and "skyrocket[ting] insurance rates" by educating consumers. *Id.* at 5 n.4, 5-6. The educational initiative lays out a scenario as a warning to consumers where a contractor misleads a homeowner into unknowingly signing an assignment of benefits, the contractor then charges "an unnecessary or inflated amount for the roof," never completes the work despite being paid in full by the homeowner's insurance company, restricts the homeowner's ability to communicate with their insurance company, and, finally, describes such contractors as "fraudulent, possibly unlicensed" and targeting whole neighborhoods. *Id.* at 4-5.

---

[11] Plaintiff does dispute, however, whether the State can have a valid interest in preventing *valid* insurance claims, as opposed to fraudulent claims, from being filed. This Court agrees that such an interest would not constitute a substantial interest to support the challenged provision. But aside from stray remarks from certain lawmakers, the record before this Court largely supports the Defendant's argument that the Legislature was largely concerned with all sorts of insurance fraud, consumer exploitation, and "skyrocketing" costs from insurance litigation.

Although there may be some overlap between the State's asserted interests, this Court agrees these interests are substantial. The Supreme Court has recognized that "States have a compelling interest in the practice of professions within their boundaries, and that as part of their power to protect the public health, safety, and other valid interests they have broad power to establish standards for licensing practitioners and regulating the practice of professions." *Goldfarb v. Va. State Bar*, 421 U.S. 773, 792 (1975). In addition, "the State may ban commercial expression that is fraudulent or deceptive without further justification." *Edenfield*, 507 U.S. at 768 (citations omitted). And, the State has a "particularly strong" interest in "protecting consumers and regulating commercial transactions." *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 460 (1978). Plus, here, the Legislature was legitimately concerned with "skyrocketing" insurance costs and the inability of some Floridians to even obtain homeowners' insurance coverage.

In sum, this Court finds that Defendant has asserted substantial interests in support of the speech regulation at issue, as required by the second question of the *Central Hudson* test. But when a ban on speech enacted to advance these interests also ensnares "truthful and nonmisleading expression . . . along with fraudulent or deceptive commercial speech, the State must satisfy the remainder of the *Central Hudson* test by demonstrating that its restriction serves a substantial state interest

and is designed in a reasonable way to accomplish that end." *Edenfield*, 507 U.S. at 768-69 (citation omitted).

### iii. Does the challenged law directly advance the State's asserted interests?

The third *Central Hudson* question is whether the State's regulation directly advances its asserted interests, rather than merely supporting them ineffectively or remotely. *Cent. Hudson*, 447 U.S. at 564. As Plaintiff aptly demonstrated at the hearing on its motion, it is at this stage of the test that the State's justification for its restriction on protected speech begins to fall apart. Indeed, it becomes clear that the challenged provision targets speech that is at least one step removed from the State's asserted interests. There is a difference between targeting disfavored conduct or practices (contractors acting as public adjusters, exploiting consumers, filing fraudulent claims, etc.) and targeting anything that may lead to that conduct— including truthful information that a consumer may have storm damage, and that storm damage may be covered by insurance. But this is the fallacy that the Defendant advances under the guise of satisfying *Central Hudson*.

Defendant argues that the challenged provision directly advances the State's interest in preventing "fraud and related increases in insurance premiums," and disrupting the parade of horribles set out in the Insurance Consumer Advocate's "scenario." But there are multiple problems with this argument. For example, Defendant relies on evidence from Florida's Insurance Consumer Advocate about

the "total cost of insurance fraud (non-medical) amount[ing] to $40 billion+"—a statistic that, on its face, would appear to include every type of non-medical insurance fraud, including fraud associated with automotive insurance. ECF No. 25 at 17-18 (citing ECF No. 13-1 at 6-10). To this point, Defendant conceded at the hearing that not all roofing contractors are fraudsters, nor is insurance fraud for roof damage the only category of fraud contributing to the $40 billion+ total cost included in the Insurance Consumer Advocate's presentation.

Other lackluster evidence Defendant asserts supports its argument that the law directly advances the State's interests includes an anecdote in the record about "how a 'direction-to-pay' agreement left a homeowner with a 'gutted home,' work that was never completed, and a $100,000 lien." *Id.* (citing ECF No. 13-1 at 9). But instead of banning protected speech, could the Legislature not directly regulate agreements between homeowners and contractors or impose liability for incomplete performance?[12]

_____

[12] In fact, it does. At the hearing, when this Court invited Defendant to cite any example of the State considering alternatives that are less burdensome on Floridians' free speech, Defendant pointed to legislation from 2019 that imposed new regulations on assignment of benefits contracts. Defendant identified this legislation in vague terms as further evidence that the State of Florida has been trying to address its insurance ills over the past few years without great success, prompting the enactment of the challenged provision now before this Court. But Defendant's reliance on the 2019 legislation as an example of the State's prior resort that did not "do enough" to address the problem and thus required further regulation of protected speech is belied by their own evidence; namely, the Insurance Commissioner's letter to the House Commerce Committee Chair, ECF No. 13-3. This letter explicitly referenced how successful the 2019 legislation was in reducing the amount of assignment-of-benefits litigation after its enactment. *See* ECF No. 13-3 at 6-7 ("[L]awsuits containing an [assignment of benefits] have dropped sharply from 2019 to 2020 . . . . [I]nitial analyses indicate the reform has had a positive impact on reducing litigation

Inexplicably, Defendant is so certain that advertisements referencing the possibility of insurance paying for roof repairs "puts homeowners on the backfoot and invites insurance fraud" that it cannot explain this logic beyond waving to the empirical record and citing "simple common sense." *Id.* at 18. It is unclear why a homeowner would be "put on their backfoot" and herded down a path towards supporting insurance fraud (wittingly or not) by learning their insurance might pay for roof repairs from a contractor's advertisement, instead of during a conversation that occurs once the contractor has already inspected their roof.

In addition to the speech regulation at issue, the Legislature saw fit to enact myriad new provisions addressing everything from licensed contractors acting as public adjusters, pre-suit notice requirements for potential plaintiffs, and restricting attorney's fees in insurance claim litigation. These additional measures were included in the very same bill that contained the provision at issue before this Court. Setting aside the State's ban on certain advertisements, the remaining provisions appear to directly target the ills visited upon Florida's insurance market from the asserted onslaught of insurance litigation. For example, the State has directly targeted its interest in "ensuring that the line between contractor and insurance

---

associated with [assignments of benefits]."). Defendant's evidence goes on to detail how other property insurance litigation has increased in the past two years, "albeit at a slower rate than before the [assignment of benefits] reform," *id*. at 8, and includes several recommendations to combat the problems associated with increased litigation—none of which concern limiting contractor advertising.

adjuster is not blurred" through enacting section 489.147(2)(d), Florida Statutes. This provision explicitly prohibits a contractor from "[i]nterpreting policy provisions or advising an insured regarding coverage or duties under the insured's property insurance policy or adjusting a property insurance claim on behalf of the insured," unless the contractor also holds a Florida license as a public adjuster. § 489.147(2)(d), Fla. Stat. This begs the question of whether a ban on truthful, nonmisleading advertisements does anything to prevent contractors from acting like unlicensed public adjusters, and if so, if that ban is reasonably tailored to serve that interest.

In short, this Court is not satisfied that the challenged law directly advances any of the State's interests. Instead, Defendant seems to suggest that because the law bans advertising that exists within the same universe as the State's asserted interests, it directly advances those interests. But the Supreme Court has already rejected such a broad pronouncement. *See Edenfield*, 507 U.S. at 771-77 (noting there was scant evidence showing a broad ban on solicitation by CPAs advanced the asserted substantial interests "in any direct and material way," nor was it justifiable as a prophylactic rule). Indeed, Plaintiff has demonstrated that the challenged provision only remotely advances the State's interest by targeting protected speech that may, potentially, lead to the conduct that seems to be causing most of the State's problems; namely, predatory contractors exploiting consumers by engaging in unlicensed

public adjusting and inducing homeowners to assign their insurance benefits, only to "take the money and run."[13]

### iv. Is the State's interest served as well by a more limited restriction on commercial speech?

This Court could end here, finding that the challenged provision is unconstitutional because it does not directly advance the State's asserted interests. But, assuming *arguendo* that the law directly advances the State's interests, this Court will resolve the final question; that is, "if the governmental interest could be served as well by a more limited restriction on commercial speech." *Cent. Hudson*, 447 U.S. at 566. Indeed, resolving this issue is appropriate in light of how the third and fourth *Central Hudson* questions operate together to answer the question of "fit."

To be crystal clear, this Court does not require the challenged provision to be the least restrictive means of advancing the State's substantial interests. This Court

---

[13] This case is unlike *Fla. Bar v. Went For It, Inc.*, where the Supreme Court upheld the Florida Bar's 30-day targeted direct-mail solicitation ban, which was put in place "to forestall the outrage and irritation with the state-licensed legal profession that the practice of direct solicitation only days after accidents has engendered." 515 U.S. 618, 631 (1995). In that case, the very harm at issue was "a function of [the] simple receipt of targeted solicitations within days of accidents." *Id*. The Supreme Court held that the ban on such solicitations in the immediate aftermath of accidents materially "target[ed] a concrete, nonspeculative harm." *Id*. at 629. On the other hand, in this case, the State has decided to ban truthful advertising on the front end to target a litany of downstream harms, including potential insurance fraud, consumer exploitation, keeping contractors in one lane and public adjusters in another, and resuscitating Florida's insurance market. The evidence Defendant provided to justify the restriction on speech only shows how disconnected the ban on certain advertising is from directly addressing the harms resulting from actions taken by the many boogeymen and women in this case; namely, unscrupulous contractors, litigious policyholders, plaintiffs' attorneys who only have eyes for fees, and the devastating effects of ever-more-destructive hurricanes, which affect all Floridians.

explicitly rejected Plaintiff's argument that strict scrutiny applies in this case, and instead agrees with Defendant that intermediate scrutiny, under the test set out in *Central Hudson*, applies here. Accordingly, for a challenged restriction to survive the final prong of *Central Hudson*, the speech restriction must not be "more extensive than necessary to serve" the State's substantial interest. *Thompson*, 535 U.S. at 371 (quoting *Cent. Hudson*, 447 U.S. at 566). The Supreme Court has made clear that "if the Government could achieve its interests in a manner that does not restrict speech, or that restricts less speech, the Government must do so." *Id*. (citing *Rubin v. Coors Brewing Co.*, 514 U.S. 476 (1995)).

Secondly, no matter how many times Defendant tries to redefine the standard as a form of rational basis review, the Supreme Court has made clear that intermediate scrutiny under *Central Hudson* is something separate and apart from "the less rigorous obstacles of rational basis review." *Edenfield*, 515 U.S. at 618. But still, Defendant cites language from the Supreme Court to indicate how low her burden is at this stage, arguing that she must show mere "reasonableness" in the "fit" between its means and its interests.[14] ECF No. 25 at 18-19 (citing *Went For It, Inc.*,

---

[14] Rather than reading this "reasonable fit" standard as a lower burden for Defendant, this Court will interpret it as aligned with the test from *Central Hudson*, as well as later Supreme Court cases, all of which bind this Court and indicate that the State's burden is much higher than showing a "fit" that is merely "rational." *See, e.g.*, *Cent. Hudson*, 447 U.S. at 565 ("The regulatory technique may extend only as far as the interest it serves. The State cannot regulate speech that poses no danger to the asserted state interest, . . . nor can it completely suppress information when narrower restrictions on expression would serve its interest as well."); *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 507 (1996) ("The State also cannot satisfy the requirement that its restriction

515 U.S. at 632). She goes on to claim that "[o]ne could argue that the Act is indeed the 'best disposition' " for achieving the Legislature's substantial interests before falling back on the argument that the Act is "[p]lainly . . . 'reasonable' . . . ." *Id.* at 19. But Defendant overstates her case.

The point bears repeating: the chosen means are not required to be the "best disposition" or the least restrictive means to advancing the State's interests. Instead, the question is whether the State's interests cannot be protected adequately by more limited regulation of Plaintiff's commercial expression. *See Sciarrino v. City of Key West, Fla.*, 83 F.3d 364, 370 (11th Cir. 1996) (quoting *Cent. Hudson*, 447 U.S. at 570). Based on the record before this Court, Plaintiff has established, and this Court finds, that the challenged provision is not a "reasonable fit" to directly advancing the State's interests. *Id*.

To recap, Defendant has identified legitimate, substantial state interests. But none of these interests are directly implicated by contractors advertising their roofing repair services to homeowners and informing homeowners that they may have storm damage that may be covered by insurance. This strongly suggests that there are less

on speech be no more extensive than necessary. It is perfectly obvious that alternative forms of regulation that would not involve any restriction on speech would be more likely to achieve the State's goal of promoting temperance."); *Thompson*, 535 U.S. at 367 ("whether it is not more extensive than is necessary to serve that interest . . . ."); *Sorrell*, 564 U.S. at 572 ("As in other contexts, these standards ensure not only that the State's interests are proportional to the resulting burdens placed on speech but also that the law does not seek to suppress a disfavored message.").

restrictive, narrowly drawn means available to the State than prohibiting protected speech which does not directly cause the identified ills. It also suggests that, given the gap between the speech affected by this regulation and the effects the State seeks to remedy, this regulation cannot be considered reasonable or proportional.

Plaintiff has demonstrated that the challenged provision arguably fails this final *Central Hudson* factor, and Defendant's rebuttal makes a poor attempt to explain why the challenged law offers a reasonable fit between the State's interests and its means of advancing those interests.[15] Although Defendant argues that the State has an interest in preventing insurance fraud from raising insurance costs for homeowners, the challenged provision does not actually restrict misleading or fraudulent advertising any more than it restricts honest, informative advertising. Defendant does not show why the State's interest in preventing contractors from doing the work of insurance adjusters is better served by a restriction on the commercial speech of contractors than a restriction on the conduct at issue—i.e., contractors performing the work of insurance adjusters. Nor does Defendant explain why this prohibition on speech is a reasonable fit for achieving its interest in reducing insurance costs for Floridians, as opposed to other lesser restrictive means like an economic policy of subsidy or costs regulations, which would not tread on

---

[15] Defendant does state that the challenged provision is a means to disrupt the "scenario" posited by Florida's Insurance Consumer Advocate. ECF No. 25 at 19. This argument is discussed in Part III.A.2.iii, *infra*.

protected speech. In short, "if the First Amendment means anything, it means that regulating speech must be a last—not first—resort." *Thompson*, 535 U.S. at 373. And Defendant's meager attempt to argue that restrictions imposed on assignment of benefits contracts in 2019 shows the State considered other means before resorting to restricting speech is belied by the comprehensive, targeted provisions enacted alongside the challenged provision.

Indeed, the record is full of other examples of "less-burdensome alternatives to the restriction on commercial speech," which undercut Defendant's claim that the challenged provision is a reasonable fit to advance its substantial interests. *See Sciarrino*, 83 F.3d at 370 (quoting *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417 n.13 (1993)). For example, the Insurance Consumer Advocate's recently implemented public campaign, discussed *supra*, appears to be precisely the type of government action that would satisfy the call by Justice Brandeis for "more speech, not enforced silence . . . ." *Whitney v. California*, 274 U.S. 357, 377 (1927) (Brandeis, J., concurring) ("If there be time to expose through discussion the falsehood and fallacies, to avert the evil by the processes of education, the remedy to be applied is more speech, not enforced silence. Only an emergency can justify repression."). The campaign warns consumers of the dangers the public (as well as the insurance market) face, and it does so without regulating protected speech. Rather than restricting information, it provides it.

Moreover, in addition to the challenged provision now before this Court, the Florida Legislature enacted a whole host of additional provisions directly targeting many of the ills spelled out in the Insurance Consumer Advocate's "scenario" regarding a hypothetical, predatory contractor.[16] And aside from new provisions that address potential fraud and consumer exploitation detailed in the "scenario," the Legislature also enacted provisions limiting attorney's fees and created pre-suit notice requirements in an apparent effort to advance the State's interest in insurance litigation reform. These "numerous and obvious less-burdensome alternatives to the restriction on commercial speech . . . [are] certainly a relevant consideration in determining whether the 'fit' between the ends and means is reasonable." *Discovery Network*, 507 U.S. at 417 n.13.

At the hearing, Plaintiff's counsel led this Court through a useful exercise using Defendant's own evidence to demonstrate the many alternatives the State considered—and enacted—along with the provision banning protected speech.

---

[16] The Insurance Consumer Advocate's educational campaign also belies Defendant's claimed fit between the substantial state interests at play and the measures used to achieve it. This new law restricts commercial speech while doing nothing to solve the problems laid out in the Insurance Consumer Advocate's "scenario." Prohibiting these advertisements does not directly protect consumers from signing contracts that then limit their ability to communicate with their own insurance companies. It does not directly protect homeowners from "fraudulent, possibly unlicensed" contractors who never complete work on their roofs. Neither does it directly protect insurance companies from being charged "unnecessary or inflated amounts," nor does it directly protect homeowners from being lied to by contractors about whether they even need a roof replacement in the first place. Possible solutions to directly attack these identified problems, without restricting protected speech, include providing more information to homeowners, requiring some form of verification for the necessity and expense of roof repairs, and limiting contractual restrictions on communication that may result from assignments of insurance benefits.

Specifically, Plaintiff identified the letter from Florida's Insurance Commissioner to the Chair of the House Commerce Committee, ECF No. 13-3, which identified the "primary cost drivers for property insurance rates in Florida," *id*. at 1, and offered a number of proposed "solutions" to these problems, *id*. at 13. Defendant attached this letter in support of its assertion that the harms the State is concerned with are indeed real and substantial. But as Plaintiff's counsel succinctly demonstrated at the hearing, the letter's "recommendations for consideration," did not include any restriction on advertising. Instead, the Office of Insurance Regulation recommended that the Legislature enact additional tort reform measures, including a new pre-suit notice requirement, stricter criteria for attorneys' fees, and reviewing the Florida Supreme Court's concurrent causation framework that "seems to have incentivized a preponderance of roof claims solicitations." ECF No. 13-3 at 13. Another measure—one of the many that were enacted following this recommendation— included limiting the claims window to "prevent fraudulent claims arising years after [a] storm has passed." *Id*. at 14. While not dispositive, this evidence is certainly relevant to the consideration of whether the challenged provision offers a reasonable fit to ameliorate the asserted problems.

"Reasonable fit" does not mean "close enough for government work." The First Amendment's protection of speech—even lesser-protected commercial speech—requires more precision than that which is available through the use of

regulatory blunderbuss. But the record before this Court shows the absence of any "careful effort" on the part of the Legislature "to draw a balance between the commercial speech rights" of contractors and "the problems the [challenged provision] addresses." *Sciarrino*, 83 F.3d at 370. Instead, Plaintiff has compellingly demonstrated that the Legislature, faced with several cost drivers negatively affecting Florida's insurance market—fraud, consumer exploitation, devastating hurricanes, and increasing litigation—responded by throwing almost everything it could at the problem during the 2021 legislative session. Unfortunately, the Legislature trampled upon Florida contractors' free speech rights in the process. Accordingly, this Court finds that the challenged provision does not pass the final step of the *Central Hudson* test.

For the above reasons, this Court finds that Plaintiff has demonstrated a substantial likelihood of success on the merits as the challenged provision likely violates the First Amendment as an impermissible prohibition on constitutionally protected commercial speech.

B

The remaining preliminary injunction factors are thoroughly intertwined with considerations already discussed regarding the merits of Plaintiff's claim. On balance, these factors weigh in favor of granting Plaintiff's motion for preliminary injunction.

A First Amendment violation does not automatically require a finding of irreparable injury; however, when the injury flowing from the violation constitutes "direct penalization, as opposed to incidental inhibition of First Amendment rights," the injury cannot "be remedied absent an injunction." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006) (quoting *Hohe v. Casey*, 868 F.2d 69, 72-73 (3d Cir. 1989) (internal quotation marks omitted)). Here, Plaintiff has shown a substantial likelihood of proving an ongoing violation of its First Amendment rights through a direct penalization for prohibited speech. Therefore, this case involves a corresponding irreparable injury that cannot be remedied without an injunction. Plaintiff regularly engages in protected activity that is at serious threat of prosecution; namely, advertising to homeowners that their insurance companies may pay for its roof repair services. *See* ECF No. 20-1 at 4-9. The challenged law, which has already gone into effect, penalizes this activity, and can result in fines of up to $10,000 per occurrence. Accordingly, this Court finds that Plaintiff has satisfied the irreparable injury prong for a preliminary injunction.

It is also clear that the threatened injuries to Plaintiff from banning Plaintiff's truthful commercial speech outweighs the State's interest in preventing fraud, protecting consumers from exploitation, and stabilizing the insurance market. *See FF Cosmetics*, 866 F.3d at 1298. Indeed, the restriction on speech only remotely advances these interests, if at all. "[E]ven a temporary infringement of First

Amendment rights constitutes a serious and substantial injury," and, here, the State "has no legitimate interest in enforcing an unconstitutional ordinance." *KH Outdoor,* 458 F.3d at 1272. This Court is persuaded that the State's legitimate interests do not outweigh the harm caused by suppressing large swaths of truthful speech in violation of the First Amendment when the State has alternative means to more directly advance its interests in a reasonable way.

Similarly, this Court is persuaded that an injunction, at this juncture, would not be adverse to the public interest. Instead, this Court finds that enjoining the Defendant from enforcing the law banning protected speech, "would advance the public's interest in freedom of speech." *FF Cosmetics*, 866 F.3d at 1298. After all, "[t]he public has no interest in enforcing an unconstitutional ordinance." *KH Outdoor*, 458 F.3d at 1272-73 (citing cases explaining that there is no irreparable harm to a municipality in preventing its enforcement of "an ordinance that may well be held unenforceable" and that the public does not have an interest in the "expenditure of time, money, and effort in attempting to enforce" such an ordinance).[17]

---

[17] Finally, a note on severability. "Consideration of the issue of severance might be premature" because this Court is not invalidating the challenged law, but instead is only preliminarily enjoining its enforcement. *Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). Nonetheless, this Court is satisfied that the challenged portion of section 489.147 is severable. *See Jones v. Gov. of Fla.*, 950 F.3d 795, 831 n.13 (11th Cir. 2020) (considering merits of severability argument upon review of district court's order granting preliminary injunction). "Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones." *Coral Springs Street Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1347 (11th Cir. 2004). "According

IV

"The Florida Legislature overstepped the boundaries of the First Amendment when it determined that the proper remedy for speech it considered 'evil' was 'enforced silence,' as opposed to 'more speech.' " *Wollschlaeger*, 848 F.3d at 1329 (Pryor, J., concurring) (quoting *Whitney*, 274 U.S. at 377). Here, the State attempted to enforce silence where the downstream effects of speech—rather than the speech

---

to the Florida Supreme Court, 'severability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions.' " *Id*. (quoting *Ray v. Mortham*, 742 So. 2d 1276, 1280 (Fla. 1999)). "Whether a statute is severable is determined by 'its relation to the overall legislative intent of the statute of which it is a part, and whether the statute, less the invalid provisions, can still accomplish this intent.' " *Id*. (quoting *Martinez v. Scanlan*, 582 So. 2d 1167, 1173 (Fla. 1991)). "[T]he unconstitutional part of a challenged statute should be excised, leaving the rest intact and in force, when doing so does not defeat the purpose of the statute and leaves in place a law that is complete." *Id*. at 1348. "Florida law thus adopts a strong presumption of severability, and squarely places the burden on the party challenging severability." *Jones*, 950 F.3d at 831 (citing *Ray*, 742 So. 2d at 1281). Again, because this Court is not invalidating any portion of the law at issue, but instead is only enjoining the Defendant from enforcing the offensive provisions, this Court need not address severability. However, it appears to this Court that the challenged provisions are severable from the rest of section 489.147. Specifically, at this juncture, this Court is satisfied that the purpose of section 489.147 is not defeated by enjoining enforcement of the purportedly unconstitutional provisions—including section 489.147(2)(a), prohibiting contractors from directly or indirectly soliciting residential property owners by means of a "prohibited advertisement," section 489.147(3), setting out the penalty for violating section 489.147(2)(a), and section 489.147(4)(b), setting out the penalty for any "unlicensed person" who violates section 489.147(2)(a). Absent enforcement of these provisions, which are concerned with the unconstitutional prohibition on commercial speech, the law still stands to regulate other prohibited activities to advance the State's valid interests in combatting fraud, exploitation, and skyrocketing insurance costs. These prohibitions include offering rebates "or any other thing of value in exchange for" permission to inspect a property owner's roof or making a claim for roof damage, offering or accepting compensation for referring services payable from insurance proceeds, interpreting insurance policy provisions, or providing an agreement for repairs without providing a good faith estimate of the cost of services and materials needed for the repairs. *See* §§ 489.147(2)(b)-(e), Fla. Stat. Ultimately, though, the parties may brief this issue in more detail at a later stage in this case if the parties disagree with this Court's analysis.

itself—was considered "evil." But the State of Florida already has a mechanism in place to offer "more speech" to combat the "evil" that purportedly flows from contractor advertising that encourages consumers to contact contractors or public adjusters for the purpose of making insurance claims for roof damage; namely, Florida's Insurance Consumer Advocate's "educational initiative." Moreover, the passage of a plethora of other targeted laws that directly address the conduct contributing to Florida's insurance ills belies Defendant's assertions that the ban on "prohibited advertisements" is a reasonable fit to advance the State's substantial interests. It is for these reasons that each of the preliminary injunction factors weighs in Plaintiff's favor.

Accordingly,

**IT IS ORDERED:**

1. Plaintiff's amended motion for preliminary injunction, ECF No. 20, is **GRANTED**.

2. Defendant must take no steps to enforce Florida Statutes §§ 489.147, (2)(a), (3), and 4(b) as they pertain to "prohibited advertisements," until otherwise ordered. This preliminary injunction binds Defendant and her officers, agents, servants, employees, and attorneys—and others in active concert or participation with any of them—who receive actual notice of this injunction by personal service or otherwise.

3. This injunction is effective immediately, without the posting of security, but Defendant may seek an order requiring the posting of security.

   **SO ORDERED on July 11, 2021.**

**s/Mark E. Walker_____**
**Chief United States District Judge**
